CARRIAGE SQUARE, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10635–75. Filed October 26, 1977.

*Paul E. Anderson*, for the petitioner.
*Vernon R. Balmes*, for the respondent.

FORRESTER, *Judge:* Respondent has determined the following deficiencies in petitioner's Federal income taxes:

| TYE Nov. 30— | Amount of deficiency |
|---|---|
| 1969 | $5,525 |
| 1970 | 66,381 |
| 1971 | 77,082 |

There are two issues for our decision: (1) Whether the consent agreement (Treasury Form 872–A) duly executed on behalf of

petitioner validly extended the statute of limitations for the years in question pursuant to section 6501(c)(4);[1] and (2) whether all of the income earned by a purported partnership of which petitioner was the only general partner should be included in petitioner's gross income pursuant to section 61.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner Carriage Square, Inc., is a corporation formed under the laws of California and having its principal office at Santa Rosa, Calif., at the time the petition was filed herein. Petitioner's Federal income tax returns for the years ended November 30, 1969, November 30, 1970, and November 30, 1971, were filed with the Western Service Center in Ogden, Utah.

Arthur Condiotti (Condiotti) engaged individually in the business of acquiring and subdividing land in northern California during the years 1967 through 1971. Additionally, during the period in question, Condiotti was president of petitioner and owned 79.5 percent of its outstanding shares of stock. The remaining 20.5 percent was owned by William P. Barlow (Barlow). Condiotti was also the president and majority shareholder of the following corporations during the taxable years ended November 30, 1969, through November 30, 1971:

| Name of corporation | Date of incorporation | Percentage of stock owned by Condiotti |
|---|---|---|
| Condiotti Enterprises, Inc. | 4/8/59 | 100 |
| Debra Homes, Inc. | 8/15/63 | 79.5 |
| Markdan | 1/17/67 | 79.5 |
| Creekside Manor, Inc. | 6/1/67 | 79 |
| Betar Homes Realty, Inc | 6/16/67 | 79.5 |

Barlow, as trustee, and Suzie Condiotti, as grantor, signed five agreements purportedly establishing trusts as of February 14, 1969, to be known as the A. Condiotti Trust One, the E.M. Condiotti Trust One, the Daniel Condiotti Trust One, the Debra Condiotti Trust One, and the Mark Condiotti Trust One (hereinafter collectively referred to as the trusts). Each trust was

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.

named according to its principal beneficiary. A. Condiotti is Arthur Condiotti, E.M. Condiotti is his wife, and Daniel, Debra, and Mark are their children born in 1958, 1953, and 1950, respectively. Suzie Condiotti, the purported grantor of the trusts, is Condiotti's mother. Barlow received five checks for $1,000 each signed by Suzie Condiotti and payable to him as trustee.

Barlow has handled Condiotti's tax affairs since 1964 and, during the relevant period, his accounting firm prepared the tax returns of Condiotti and the corporations which he controlled. Barlow advised Condiotti to have the trusts set up and he was compensated for such advice.

On February 14, 1969, the trusts, as limited partners, and petitioner, as general partner, entered into a "Limited Partnership Agreement." Barlow signed such agreement on behalf of petitioner as its assistant secretary as well as on behalf of the trusts, as trustee of each. The purpose of such partnership was "to carry on the business to acquire and develop residential property," and it was to do business under the name of "Sonoma Development Company" (Sonoma). Petitioner contributed $556 to its capital and each of the trusts contributed $1,000. Each trust was entitled to an 18-percent share of Sonoma's profits whereas petitioner was entitled to a 10-percent share. The trusts were not obligated to contribute any additional capital and they were liable for the debts of Sonoma only to the extent of their capital contribution plus their share of any retained profits. Petitioner was liable for the debts of Sonoma to the same extent as partners in a general partnership, but it was not obligated, in the event of a loss, to make up the capital contributions of the limited partners. The partnership agreement also contained the following provisions:

7. Management Duties and Restrictions

\* \* \* \* \* \* \*

The general partner shall devote only such time to the affairs and business of the partnership as may be required for the conduct thereof. It is specifically understood that the partnership is a side line for the general partner and that such partner shall be free to engage in any other business or occupation without the consent of any other partner, save and except in competing businesses.

\* \* \* \* \* \* \*

8. Dissolution of Partnership

Upon agreement of the partners, the partnership may be dissolved and the assets liquidated forthwith. This partnership shall also dissolve upon the dissolution, bankruptcy or insolvency of the general partner or at the option of

the limited partners, upon its failure to devote its time to the affairs of the partnership as may be required for the conduct thereof for a period of 120 continuous days. * * *

*     *     *     *     *     *     *

In the event of dissolution of the partnership the general partner or limited partners, and each of them, may purchase the business and assets of the partnership by payment to those partners not desiring to continue the business, the amount of said partner's capital account and drawing account as of the date of dissolution.

*     *     *     *     *     *     *

11. Assignability

If a limited partner shall be desirous of selling his interest in the partnership, he shall first offer to sell such interest to the other partners at a price to be fixed and determined by the selling partner, and if the other partners shall not accept such offer within 30 days after tender, then the selling partner shall be at liberty to sell his interest to any other person at the same or a higher price, but the selling partner shall not sell his interest at a lesser price to any other person or persons unless and until such offer shall have been submitted to the other partners at such lower price, and said last mentioned offer shall not have been accepted within 30 days.

Sonoma filed a certificate of limited partnership in Sonoma County, Calif. At the time the partnership was formed, it was possible to borrow from a bank all of the money necessary to finance a real estate development and construction project.

Sonoma engaged in the business of arranging to have homes built and sold. Sonoma purchased all of the lots in the Elizabeth Manor I subdivision (Elizabeth Manor) from Condiotti and his wife. The Condiottis had purchased the undeveloped property for Elizabeth Manor I from W. Garfield (Garfield) on December 31, 1968, by paying $6,000 down, assuming existing deeds of trust for amounts totaling $16,702, and obtaining a secured loan of $16,628.51 from Garfield. The Condiottis then borrowed $145,000 from the Crocker Citizens National Bank (Crocker) to develop the land by subdividing and installing offsite improvements such as streets, sewers, and utility connections. With the proceeds of such loan, the Condiottis paid the loan fee, paid off the deeds of trusts which they had assumed when purchasing the Elizabeth Manor I property, and expended approximately $127,000 on improvements. Garfield agreed to subordinate his secured interest to that of Crocker.

Sonoma did not purchase all of the lots in Elizabeth Manor I at the same time, but it purchased several at a time from the Condiottis with funds advanced by Crocker. Sonoma then

obtained a construction loan from Crocker, and from its proceeds Sonoma repaid Crocker the funds advanced by it to enable Sonoma to purchase the land. The remainder of the loan proceeds was retained by Crocker in a construction loan account to be disbursed in accordance with the construction loan agreement as construction of the houses progressed. As soon as Sonoma sold five or six houses it went back to Crocker and requested another loan to build more houses until it had gotten sufficient loans to build the entire subdivision.

Sonoma was able to finance the construction and sale of houses in its subdivisions with no funds by obtaining loans for larger amounts than those needed for construction and by getting the owner of the undeveloped land to subordinate his deed of trust to the deed of trust given to the lender of the construction loan.

Sonoma also constructed and sold houses in the Rincon View II subdivision. The Rincon View II subdivision was handled in a manner similar to Elizabeth Manor I. The Condiottis bought undeveloped land on which they installed offsite improvements using borrowed money. Once the majority of the improvements were installed on the land, the subdivided lots were transferred to Sonoma and construction of the houses began.

The $5,556 contributed to the partnership by the trusts and petitioner was used as seed money. The money to purchase the property was obtained by construction loans. Sonoma hired Condiotti Enterprises, Inc., another corporation owned by Condiotti, to construct houses on the lots that it purchased.

Condiotti and his wife gave a continuing guarantee to Crocker for the liabilities of their corporations when they began borrowing funds from Crocker because Crocker would not lend money on a subdivision without such guarantee. A continuing guarantee for $4 million, which was dated November 14, 1969, and signed by Condiotti and his wife, covered any liabilities to Crocker by Condiotti Enterprises, Inc., Sonoma Development Co., petitioner, and five other corporations. A continuing guarantee dated March 19, 1970, for $3 million was signed by "Sonoma Development Company by: Carriage Square, Inc., A. Condiotti, Pres." and covered any liabilities owed to Crocker by the Condiottis, Condiotti Enterprises, Inc., petitioner, and four other corporations.

Sonoma filed U.S. partnership income tax returns (Forms 1065) for the period from February 14, 1969, through December

31, 1969, and for the calendar years 1970 and 1971 reporting income for such periods in the following amounts: $2,600 in 1969; $142,600 in 1970; and $177,742 in 1971.

Petitioner's U.S. corporation income tax returns for the taxable years ended November 30, 1969, November 30, 1970, and November 30, 1971, were received by the Internal Revenue Service on February 12, 1970, February 16, 1971, and March 21, 1972, respectively. Forms 872 were signed by Condiotti on behalf of petitioner on May 2, 1972, and December 7, 1972, so that the period of limitations upon assessment for the taxable year ended November 30, 1969, was extended to December 31, 1974. A Form 872 consent was signed by Condiotti on behalf of petitioner on December 19, 1973, extending the period of limitations upon assessment for the taxable year ended November 30, 1970, to December 31, 1974.

A Special Consent Fixing Period of Limitation Upon Assessment of Income Tax (Form 872–A) was signed by Condiotti on behalf of petitioner on November 21, 1974, providing that the amounts of any Federal income tax due under any of petitioner's returns for its taxable years ended November 30, 1969, November 30, 1970, and November 30, 1971—

under existing or prior revenue acts, may be assessed at any time on or before the 90th day after (1) mailing by the Internal Revenue Service of written notification to the taxpayer(s) of termination of Appellate Division consideration, or (2) receipt by the Regional Appellate Division branch office considering the case of written notification from the taxpayer(s) of election to terminate this agreement, except that if in either event a statutory notice of deficiency in tax for any such year is sent to the taxpayer(s) the running of the time for making any assessment shall be suspended for the period during which the making of an assessment is prohibited and for 60 days thereafter. If such statutory notice is sent to the taxpayer(s) and neither of the conditions enumerated (1) and (2) in the preceding sentence have occurred, the time for making such assessment will expire 60 days after the period during which the making of an assessment is prohibited. However, this agreement will not reduce the period of time otherwise provided by law for making such assessment.

In his statutory notice, dated September 26, 1975, respondent allocated all of Sonoma's income to petitioner and thereby increased petitioner's income for the taxable years ended November 30, 1969, November 30, 1970, and November 30, 1971, by $2,340, $130,713, and $160,558, respectively. Since Sonoma filed its return on a calendar year basis and petitioner used a fiscal year ending November 30, it was necessary for respondent

to recompute Sonoma's income using a fiscal year ending November 30.[2] At trial, petitioner objected to respondent's method of computing Sonoma's income on petitioner's fiscal year basis.

## OPINION

Petitioner argues that section 6501(c)(4)[3] authorizes extending

---

[2]In his brief, respondent set forth the following computations:

*FYE 11/30/69*

| | |
|---|---:|
| Earnings reported by Sonoma for 1969 (2/1 to 12/31) | $2,600 |
| Earnings for period from 2/1/69 to 11/30/69 (9/10) | 2,340 |
| Earnings from Sonoma reported by petitioner | 0 |
| Income allocated to petitioner | $2,340 |

*FYE 11/30/70*

| | |
|---|---:|
| Earnings reported by Sonoma for 1970 | $142,600 |
| Earnings for period from 1/1/70 to 11/30/70 (11/12) | 130,713 |
| Add December 1969 earnings of Sonoma | 260 |
| Earnings of Sonoma for period from 12/1/69 to 11/30/70 | 130,973 |
| Earnings from Sonoma reported by petitioner | 260 |
| Income allocated to petitioner | $130,713 |

*FYE 11/30/71*

| | |
|---|---:|
| Earnings reported by Sonoma for 1971 | $177,742 |
| Earnings for period from 1/1/71 to 11/30/71 (11/12) | 162,965 |
| Add earnings for December 1970 | 11,883 |
| Earnings of Sonoma for period 12/1/70 to 11/30/71 | 174,848 |
| Earnings from Sonoma reported by petitioner | 14,260 |
| Income allocated to petitioner | $160,588 |

[3]Sec. 6501(c)(4). EXTENSION BY AGREEMENT.— Where, before the expiration of the time prescribed in this section for the assessment of any tax imposed by this title, except the estate tax provided in chapter 11, both the Secretary or his delegate and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon.

the period of limitation upon assessment of income tax for a *definite period only* so that Treasury Form 872–A, which purports extension of such period for an indefinite period, is invalid. Of course, if the Form 872–A consent agreement is invalid, then assessment of a deficiency in petitioner's taxes for the years in question is barred and respondent's deficiency notice is erroneous. Sec. 6501(a), (b), and (c).

In *McManus v. Commissioner*, 65 T.C. 197, 207 (1975), on appeal (9th Cir. 1976), we held that since section 6501(c)(4) contained "no requirement that the statute of limitations can only be extended for a definite period of time," the Form 872–A agreement was valid to extend the period of limitations for a reasonable time. In the instant case, the Form 872–A consent agreement was signed by Condiotti on behalf of petitioner on November 21, 1974, and the deficiency notice is dated only approximately 10 months later, on September 26, 1975. There is no evidence whatsoever that petitioner notified respondent of its desire to terminate the agreement or complained of the delay. Since we believe that *McManus* was correctly decided for the reasons there given, and believe respondent has reasonably used the Form 872–A agreement in the case at bar, we hold such agreement valid.

Respondent argues that he has properly allocated the income of Sonoma to petitioner, its sole general partner, for the years in question because such income was earned solely by the services performed and the financial risks assumed by petitioner.

Section 704(e)(1)[4] provides:

Sec. 704(e)(1). RECOGNITION OF INTEREST CREATED BY PURCHASE OR GIFT.—A person shall be recognized as a partner for purposes of this subtitle if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person.

Section 1.704–1(e)(1)(iv), Income Tax Regs., provides the following amplification of section 704(e)(1):

Sec. 1. 704–1(e)(1)(iv). *Capital as a material income-producing factor.* For purposes of section 704(e)(1), the determination as to whether capital is a material income-producing factor must be made by reference to all the facts of each case. Capital is a material income-producing factor if a substantial portion

---

[4]Although such section is primarily directed toward "family partnership," its language is sufficiently broad to cover the instant case which does not involve a "family partnership" as defined in sec. 704(e)(3). *Evans v. Commissioner*, 54 T.C. 40, 51 (1970), affd. 447 F.2d 547 (7th Cir. 1971).

of the gross income of the business is attributable to the employment of capital in the business conducted by the partnership. In general, capital is not a material income-producing factor where the income of the business consists principally of fees, commissions, or other compensation for personal services performed by members or employees of the partnership. On the other hand, capital is ordinarily a material income-producing factor if the operation of the business requires substantial inventories or a substantial investment in plant, machinery, or other equipment.

After carefully reviewing the record in the instant case, we hold that capital was not a material income-producing factor in Sonoma's business. We note at the outset that, with a total initial capital contribution of only $5,556, Sonoma earned $322,942 during its first 3 years.[5]

Sonoma did employ large amounts of *borrowed* capital in constructing houses on the lots which it purchased from the Condiottis. While borrowed capital, under other circumstances, may be "capital" for section 704(e)(1) purposes, we hold that it is not in this instance. Petitioner, as Sonoma's only general partner, was the only partner in Sonoma whose liability for repayment of such borrowed capital was not substantially limited. Furthermore, Crocker would not have loaned such capital to Sonoma secured by partnership assets (or the general partner's assets) alone, but would loan such capital to Sonoma only after a continuing guarantee had been executed making the Condiottis liable for Sonoma's debts to Crocker in the event that Sonoma did not pay them.

Since Sonoma made a large profit with a very small total capital contribution from its partners and was able to borrow, and did borrow, substantially all of the capital which it employed in its business upon the condition that such loans were guaranteed by nonpartners, we think that section 1.704–1(e)(1)(i),[6] Income Tax Regs., prohibits the borrowed capital in the instant case from being considered as a "material income-producing factor." The regulation requires that such capital be "contributed by the partners." This view is supported by *Bateman v. United States*, 490 F.2d 549, 553 (9th Cir. 1973):

---

[5]*Strickler v. Commissioner*, a Memorandum Opinion of this Court dated Aug. 23, 1951, affd. 196 F.2d 727 (3d Cir. 1952).

[6]Sec. 1.704–1(e). Family partnerships—(1) In general—(i) Introduction. The production of income by a partnership is attributable to the capital or services, or both, *contributed by the partners*. The provisions of subchapter K, chapter 1 of the Code, are to be read in the light of their relationship to section 61, which requires, inter alia, that income be taxed to the person who earns it through his own labor and skill *and the utilization of his own capital*. [Emphasis supplied.]

had the good will been personal to the Batemans, the transfers of interest to the trusts would not have received tax recognition. Under those circumstances, without the very substantial good will owned by BBC, the partnership would not have been one in which capital was a material income-producing factor.

* * *

We hold, therefore, that Sonoma was not a partnership in which capital was a material income-producing factor and consequently section 704(e)(1) is inapplicable. However, the trusts must still be recognized as partners unless it appears that the parties did not in good faith and acting with a business purpose intend to join together as partners. *Commissioner v. Culbertson*, 337 U.S. 733 (1949); *Poggetto v. United States*, 306 F.2d 76 (9th Cir. 1962).

We are unable to find that the parties acted with a business purpose because the trusts received a 90-percent share of Sonoma's profits even though they made no material contribution to the business. Their capital contribution was not material since Sonoma could borrow substantially all the money necessary to conduct its business as long as the Condiottis guaranteed its debts (which they did). The trusts provided no services and their liability was limited to the amount of their contributed capital plus their share of retained earnings. Furthermore, we cannot find that the parties in good faith intended to join together as partners where petitioner provided all the services necessary for the conduct of a partnership business, assumed substantially all risk of loss, and utilized its business contacts in obtaining the large loans required by the partnership business, but nevertheless was given only a share of the partnership profits which was exactly equal to its share of the capital contributions. Accordingly, we hold that the trusts were not bona fide partners of Sonoma so that respondent correctly allocated the income earned by Sonoma to petitioner.[7]

In its petition, petitioner asserted errors in respondent's

---

[7]At trial, petitioner objected to the manner in which respondent recomputed the income of Sonoma, a calendar year basis taxpayer, using petitioner's fiscal year ending Nov. 30. There is some indication in the record that petitioner desired a reconsideration of such issue as part of a computation under Rule 155, Tax Court Rules of Practice and Procedure. However, petitioner did not formally request such a reconsideration nor did it state its grounds for objecting to respondent's recomputation of Sonoma's income. We find respondent's manner of recomputing Sonoma's income to be reasonable. Moreover, it is presumptively correct, Rule 142 (a), Tax Court Rules of Practice and Procedure, and petitioner has presented no evidence or arguments to support its objections. Therefore, we do not believe this is a proper matter to be resolved under Rule 155 and we accept respondent's computations as correct.

partial disallowance of its surtax exemption for the taxable year ended November 30, 1969, under section 1561(a),[8] and in respondent's determination that petitioner was liable for an additional tax for the taxable years ended November 30, 1970, and November 30, 1971, under section 1562(b).[9]

Petitioner apparently has abandoned these issues since it presented no evidence at trial and does not urge them on brief. In any event, petitioner has failed to prove that it was not a member of a controlled group of corporations for the years in

---

[8]SEC. 1561(a). GENERAL RULE.—If a corporation is a component member of a controlled group of corporations on a December 31, then for purposes of this subtitle the surtax exemption of such corporation for the taxable year which includes such December 31 shall be an amount equal to—

(1) $25,000 divided by the number of corporations which are component members of such group on such December 31, or

(2) if all such component members consent (at such time and in such manner as the Secretary or his delegate shall by regulations prescribe) to an apportionment plan, such portion of $25,000 as is apportioned to such member in accordance with such plan.

The sum of the amounts apportioned under paragraph (2) among the component members of any controlled group shall not exceed $25,000.

(b) CERTAIN SHORT TAXABLE YEARS.—If a corporation—

(1) has a short taxable year which does not include a December 31, and

(2) is a component member of a controlled group of corporations with respect to such taxable year.

then for purposes of this subtitle the surtax exemption of such corporation for such taxable year shall be an amount equal to $25,000 divided by the number of corporations which are component members of such group on the last day of such taxable year. For purposes of the preceding sentence, section 1563(b) shall be applied as if such last day were substituted for December 31.

[9]For petitioner's taxable year ended Nov. 30, 1971, sec. 1562(b)(1) read as follows:

(b) ADDITIONAL TAX IMPOSED.—

(1) GENERAL RULE.—If an election under subsection (a)(1) by a controlled group of corporations is effective with respect to the taxable year of a corporation, there is hereby imposed for such taxable year on the taxable income of such corporation a tax equal to 6 percent of so much of such corporation's taxable income for such taxable year as does not exceed *the amount of such corporation's surtax exemption for such taxable year*. This paragraph shall not apply to the taxable year of a corporation if—

(A) such corporation is the only component member of such controlled group on the December 31 included in such corporation's taxable year which has taxable income for a taxable year including such December 31, or

(B) such corporation's surtax exemption is disallowed for such taxable year under any provision of this subtitle.

[Emphasis supplied.]

For petitioner's taxable year ended Nov. 30, 1970, sec. 1562(b)(1) read as above except for the underlined portion which read "$25,000."

issue. It follows that respondent's determinations as to these issues are sustained.

*Decision will be entered for the respondent.*

Reviewed by the Court.

GOFFE, *J.*, concurring: I concur in the result that the trusts should not be recognized as limited partners but I cannot agree with the approach used by the majority. The majority holds that *borrowed* capital was not a material income-producing factor in the Sonoma limited partnership. There is an attempt to limit such holding to the facts of this case; nevertheless it places a qualification on the concept of "capital as a material income-producing factor" which concept is found in other areas of the tax law; i.e., e.g., definition of earned income from sources without the United States (sec. 911); income subject to the 50-percent maximum rate on personal service income (sec. 1348); earned income for self-employment tax purposes (sec. 1.1402(a)–2(a), Income Tax Regs.); election as to treatment of income subject to foreign community property laws (sec. 981); and the qualification of retirement plans covering self-employed individuals (sec. 1.401–10, Income Tax Regs.). The opinion of the majority is also out of touch with reality. Borrowed capital is almost invariably involved (usually to the maximum extent possible) in real estate developments. Moreover, the rationale adopted by the majority is gratuitous; it was not presented by respondent and, therefore, not argued by the parties in their briefs.

The majority emphasizes the unlimited liability of the general partner (petitioner) as distinguished from the limited liability of the limited partners (trusts). Such distinction is meaningless because the degree of liability between general partners and limited partners is not only customary, it is definitional. Indeed, the regulations recognize this truism. Sec. 1.704–1 (e)(3)(ii)(c), Income Tax Regs.

All of the members of the Court recognize that the tax avoidance scheme of Arthur Condiotti and his accountant-tax adviser, William P. Barlow, cannot be allowed to stand. It is an obvious attempt, and a somewhat crude attempt, lacking

legitimate business purposes, to spread large anticipated sums of ordinary income among several taxpayer trusts to achieve a low rate of tax on such income. The tax-planning technique of splitting anticipated ordinary income among several taxpayers created by the taxpayer who generates the income is a well known method of attempting to minimize the rate of tax on such income; i.e., e.g., multiple corporations, multiple trusts, family partnerships. The only disagreement among the members of the Court is how best to set aside the tax avoidance scheme. I view the majority opinion as a strained approach to the problem and, therefore, reason for an alternative which is less dangerous, supported completely by the regulations and in harmony with the congressional intent of section 704. It would seem to me that the majority should examine the facts in light of the regulations promulgated under section 704(e) as the Court did in *Krause v. Commissioner*, 57 T.C. 890 (1972), affd. 497 F.2d 1109 (6th Cir. 1974), cert. denied 419 U.S. 1108 (1975).

Arthur Condiotti and his tax adviser Barlow owned all of the issued and outstanding stock of petitioner. Condiotti, using his mother as grantor, established five trusts, naming Barlow as trustee of each. The trusts were for the benefit of Condiotti, his wife, and his three children. They were funded by cash contributions of $1,000 each which Condiotti gave to his mother. On the same day that the trust agreements were executed, Barlow, as trustee of the five trusts, acquired limited partnership interests for each of the trusts, using the entire corpus of each trust. The limited partnership consisted of the five trusts and petitioner, the general partner, which contributed only $556 to the capital of the partnership. Under the limited partnership agreement, each limited partner (trust) received an 18-percent share of the profits and assets upon dissolution and the general partner (petitioner) received only a 10-percent share of the profits and assets upon dissolution. The substantial sums of money used by Sonoma to generate its ordinary income came almost exclusively from loans assumed by petitioner or borrowed by petitioner and guaranteed by Condiotti and his wife.

The obvious starting point for the examination of the Condiotti-Barlow scheme must be section 704(e),[1] entitled "Fami-

---

[1]SEC. 704. PARTNER'S DISTRIBUTIVE SHARE.

(e) FAMILY PARTNERSHIPS.—

(1) RECOGNITION OF INTEREST CREATED BY PURCHASE OR GIFT.—A person shall be recognized as a

ly Partnership." The predecessors of section 704(e) were sections 191 and 3797(a)(2) of the Internal Revenue Code of 1939. Those identical sections were added by the Revenue Act of 1951. The committee reports covering the enactment of sections 191 and 3797(a)(2) clearly declare the intent of Congress. H. Rept. 586, 82d Cong., 1st Sess. (1951), 1951-2 C.B. 357, 380; S. Rept. 781,82d Cong., 1st Sess. (1951), 1951-2 C.B. 458, 485. After the Supreme Court decided *Commissioner v. Tower,* 327 U.S. 280 (1946), and *Commissioner v. Culbertson,* 337 U.S. 733 (1949), numerous cases arose involving transfers of capital among family members in the organization of family partnerships. Such family partnerships were frequently held to be invalid based upon such concepts as "intention," "business purpose," "reality," and "control." Congress enacted the predecessor of section 704(e) to—

harmonize the rules governing interests in the so-called family partnership with those generally applicable to other forms of property or business. Two principles governing attribution of income have long been accepted as basic: (1) income from property is attributable to the owner of the property; (2) income from personal services is attributable to the person rendering the services. There is no reason for applying different principles to partnership income. * * * [H.Rept. 586, *supra,* 1951-2 C.B. at 380; S. Rept. 781, *supra,* 1951-2 C.B. at 485.]

Section 1.704–1(e), Income Tax Regs., reflects the intent of Congress in enacting the predecessor of section 704(e). Petitioner does not challenge the validity of the regulations.

The facts of this case should be examined under the tests specified by the various portions of section 1.704–1(e), Income Tax Regs., entitled "Family Partnerships." The income of any

---

partner for purposes of this subtitle if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person.

(2) DISTRIBUTIVE SHARE OF DONEE INCLUDIBLE IN GROSS INCOME.—In the case of any partnership interest created by gift, the distributive share of the donee under the partnership agreement shall be includible in his gross income, except to the extent that such share is determined without allowance of reasonable compensation for services rendered to the partnership by the donor, and except to the extent that the portion of such share attributable to donated capital is proportionately greater than the share of the donor attributable to the donor's capital. The distributive share of a partner in the earnings of the partnership shall not be diminished because of absence due to military service.

(3) PURCHASE OF INTEREST BY MEMBER OF FAMILY.—For purposes of this section, an interest purchased by one member of a family from another shall be considered to be created by gift from the seller, and the fair market value of the purchased interest shall be considered to be donated capital. The "family" of any individual shall include only his spouse, ancestors, and lineal descendants, and any trusts for the primary benefit of such persons.

partnership must be taxed to the person whose labor and skills earn the income and/or to the person whose own capital is utilized to produce the income. Sec. 1.704–1(e)(1), Income Tax Regs. Under section 752(a) of the Code, the increases in petitioner's liabilities as a result of being a partner and the liabilities of the partnership assumed by petitioner are deemed to be contributions of money to the partnership, yet the profits of the partnership were allocated among the partners in the ratio of their initial contributions which were nominal in comparison to the tremendous liabilities assumed by petitioner. Even under this broad principle, it is readily apparent that the income of the partnership was not taxed to the partner who provided the capital. In the usual limited partnership, the limited partners contribute substantial sums needed to earn the income and the general partner performs services.

In general, a person will be recognized as a partner for income tax purposes if he owns a capital interest in such partnership whether or not such interest is derived by purchase or gift from any other person. Sec. 1.704–1(e)(1)(ii), Income Tax Regs. However, in either the case of a purchase or a gift, the general rule is qualified as follows:

A donee or purchaser of a capital interest in a partnership is not recognized as a partner under the principles of section 704(e)(1) *unless such interest is acquired in a bona fide transaction, not a mere sham for tax avoidance or evasion purposes,* and the donee or purchaser is the real owner of such interest. To be recognized, a transfer must vest dominion and control of the partnership interest in the transferee. The existence of such dominion and control in the donee is to be determined from *all the facts and circumstances.* A transfer is not recognized if the transferor retains such incidents of ownership that the transferee has not acquired full and complete ownership of the partnership interest. *Transactions between members of a family will be closely scrutinized, and the circumstances, not only at the time of the purported transfer but also during the periods preceding and following it, will be taken into consideration in determining the bona fides or lack of bona fides of the purported gift or sale.* * * * [Sec. 1.704–1(e)(1)(iii), Income Tax Regs.; *Krause v. Commissioner,* 57 T.C. 890, 897 (1972). Emphasis added.]

If all of the facts and circumstances are examined, the limited partnership interests were obviously not acquired in a bona fide transaction but were instead acquired as part of the Condiotti-Barlow scheme to avoid income tax. All of the parties involved were members of one family (that of Arthur Condiotti) except Barlow who was a "good friend and business associate" of

Condiotti for approximately 20 years; who was Condiotti's accountant and tax adviser; who prepared the trust agreements and partnership agreement and was paid for doing so; who advised Condiotti to establish the limited partnership and trusts; who owned enough of the stock of petitioner-general partner (20.5 percent) so that Condiotti did not own 80 percent (control); who was the sole trustee of the five trusts for the benefit of Condiotti, his wife, and three children; who executed, as preparer, many of the income tax returns of Condiotti, of petitioner, of Sonoma partnership, and of the five trusts and whose certified public accounting firm prepared all of such returns; and who was the only person who executed the Sonoma limited partnership agreement on behalf of petitioner-general partner as its assistant secretary and as trustee-limited partner for each of the five trusts for the benefit of Condiotti, his wife, and children. These relationships are more than coincidental; they overwhelmingly demonstrate that Barlow was amenable to the will of Condiotti. Sec. 1.704–1(e)(2)(vii), Income Tax Regs.

The circumstances surrounding the creation of the trusts and limited partnership reek with suspicion. Condiotti gave the $5,000 to his mother who, in turn, became the grantor of the five trusts for the benefit of Condiotti, his wife, and his three children. The five trust agreements were executed by Condiotti's mother as grantor and Barlow as trustee on the same day, but Barlow testified that he never saw Condiotti's mother and thought she lived in New York although obviously Barlow executed the trust agreements in California. On the same day he executed the trust agreements Barlow executed the limited partnership agreement on behalf of petitioner, the general partner, and as trustee for each of the limited partners. Barlow testified that he intended to invest the $5,000 in the Sonoma limited partnership before the creation of the trusts or creation of the partnership. All of the facts involved amply demonstrate that the acquisitions of the limited partnership interests were nothing more than shams for tax avoidance purposes.

The acquisition of each limited partnership interest was cast in terms of a purchase so such acquisitions should first be examined under the provisions of section 1.704–1(e)(4), Income Tax Regs. A purchase of a capital interest in a partnership will be recognized as bona fide if, considering all relevant factors, it has the usual characteristics of an arm's-length transaction. Sec. 1.704–

1(e)(4)(ii) *(a)* , Income Tax Regs. The purchase in the instant case had none of the characteristics of an arm's-length transaction. It was between related parties pursuant to an overall plan to avoid taxes. If the purchase is not arm's-length it can, nevertheless, be recognized if—

It can be shown, in the absence of characteristics of an arm's-length transaction, that the purchase was genuinely intended to promote the success of the business by securing participation of the purchaser in the business or by adding his credit to that of the other participants. [Sec. 1.704–1(e)(4)(ii)(*b*), Income Tax Regs.]

That test cannot be fulfilled because each of the trusts contributed only "seed money" of $1,000 each and were liable for no more. The trusts did nothing to promote the success of the business; they participated in nothing but profits.

The trusts, having failed to satisfy the tests for purchased interests in a family partnership, may be recognized only if they meet the requirements applicable to the acquisition of a partnership interest by gift. Sec. 1.704–1(e)(4)(i), Income Tax Regs. Indeed, the limited partnership interests were acquired by gifts of cash by Condiotti through his mother to Barlow as trustee for the benefit of himself, his wife, and his three children. Section 1.704–1(e)(2)(i) provides:

*Whether an alleged partner who is a donee of a capital interest in a partnership is the real owner of such capital interest, and whether the donee has dominion and control over such interest, must be ascertained from all the facts and circumstances of the particular case. Isolated facts are not determinative; the reality of the donee's ownership is to be determined in the light of the transaction as a whole.* The execution of legally sufficient and irrevocable deeds or other instruments of gift under state law is a factor to be taken into account but is not determinative of ownership by the donee for the purposes of section 704(e). *The reality of the transfer and of the donee's ownership of the property attributed to him are to be ascertained from the conduct of the parties with respect to the alleged gift and not by any mechanical or formal test.* Some of the more important factors to be considered in determining whether the donee has acquired ownership of the capital interest in a partnership are indicated in subdivisions (ii) to (x), inclusive, of this subparagraph. [Emphasis added.]

The reality of the transaction as a whole, as explained above, clearly shows that the general donee test of ownership cannot be satisfied. Moreover, the scheme fails to satisfy the specific test of section 1.704–1(e)(2)(iii):

Controls inconsistent with ownership by the donee may be exercised indirectly as well as directly, for example, through a separate business organization,

estate, trust, individual, or other partnership. Where such indirect controls exist, the reality of the donee's interest will be determined as if such controls were exercisable directly.

Here, the donor, Condiotti, and Barlow completely controlled petitioner, which was the sole general partner of Sonoma, which, under the partnership agreement, had the exclusive authority to make decisions of the partnership. In addition to the specific tests of retention of control by the donor, the final "catch-all" provision of section 1.704–1(e)(2)(vi), Income Tax Regs., applies:

However, despite formal compliance with the above factors, other circumstances may indicate that the donor has retained substantial ownership of the interest purportedly transferred to the donee.

Not by the wildest stretch of the imagination can Barlow satisfy the tests imposed by the regulations on recognition of a trustee as a partner in a family partnership.

*Trustees as partners.* A trustee may be recognized as a partner for income tax purposes under the principles relating to family partnerships generally as applied to the particular facts of the trust-partnership arrangement. A trustee who is unrelated to and independent of the grantor, and who participates as a partner and receives distribution of the income distributable to the trust, will ordinarily be recognized as the legal owner of the partnership interest which he holds in trust unless the grantor has retained controls inconsistent with such ownership. However, if the grantor is the trustee, or *if the trustee is amenable to the will of the grantor, the provisions of the trust instrument (particularly as to whether the trustee is subject to the responsibilities of a fiduciary), the provisions of the partnership agreement, and the conduct of the parties must all be taken into account in determining whether the trustee in a fiduciary capacity has become the real owner of the partnership interest.* Where the grantor (or person amenable to his will) is the trustee, the trust may be recognized as a partner only if the grantor (or such other person) in his participation in the affairs of the partnership actively represents and protects the interests of the beneficiaries in accordance with the obligations of a fiduciary and does not subordinate such interest to the interests of the grantor. [Sec. 1.704–1(e)(2)(vii), Income Tax Regs. Emphasis added.]

Barlow is amenable to the will of Condiotti for numerous business reasons, the most apparent one being that Barlow is the only minority shareholder of petitioner and Condiotti is the only majority shareholder. The close relationship of Condiotti and Barlow spelled out above amply reveals how amenable Barlow is to his client and good friend, Condiotti.

The specific provision in the regulations as to limited partners in family partnerships likewise cannot be satisfied here:

The recognition of a donee's interest in a limited partnership will depend, as in the case of other donated interests, on whether the transfer of property is real and on whether the donee has acquired dominion and control over the interest purportedly transferred to him. [Sec. 1.704–1(e)(2)(ix), Income Tax Regs.]

The donees of the limited partnership interests are the donor himself, his wife, and his three children. The trustee for the limited partners, Barlow, was subject to the dominion and control of Condiotti, the donor. Petitioner offered no evidence whatever of the independence of Barlow and I suspect there could be no such evidence.

Finally, the regulations speak of motive.

If the reality of the transfer of interest is satisfactorily established, the motives for the transaction are generally immaterial. However, *the presence or absence of a tax-avoidance motive is one of many factors to be considered in determining the reality of the ownership of a capital interest acquired by gift.* [Sec. 1.704–1(e)(2)(x), Income Tax Regs. Emphasis added.]

This brings us back to the conclusion stated earlier that the creation of the trusts and the limited partnerships was nothing more than a scheme to evade tax. Prior to their creation, Condiotti and his corporations, including petitioner, engaged in the identical business engaged in by the Sonoma limited partnership and Sonoma, in actuality, performed no useful function except the splitting up of income to five more taxpayers.

Although the parties here substantially carried out the formal steps in creating the trusts and the partnership, they represent shams. *Morton v. Commissioner*, 46 T.C. 723 (1966). The parties having flunked all of the tests, I would, therefore, hold that the trusts cannot be recognized as partners and sustain the Commissioner in his determination that all of the income of the Sonoma limited partnership is taxable to petitioner.

SCOTT, DAWSON, IRWIN, STERRETT, and WILES, *JJ.*, agree with this concurring opinion.

TANNENWALD, *J.*, dissenting in part: I share the majority's concern over the attempt by Condiotti to spread the tax liability resulting from his business operation among petitioner and the numerous trusts established for the benefit of his family members. However, I cannot agree with the technique chosen by

the majority to attack the effect of the partnership agreement and thereby allocate the entire income of the partnership to petitioner. Under my approach, part of the partnership income, albeit a small portion, would be allocated to the trusts, and it is for this reason that I record my dissent rather than concurrence.

Section 704 (e)(1) provides that "A person shall be recognized as a partner" if two conditions are satisfied: first, the individual must own a capital interest in the partnership; second, capital must be a material income-producing factor in the partnership. The majority reasons that the interests of the trusts should not be recognized because the second requirement has not been satisfied. Its rationale is that capital was not a material income-producing factor in Sonoma's business because substantially all of the capital employed in the business was borrowed and the partnership was able to borrow such funds only because Condiotti, who was not a partner, guaranteed the loans. I cannot agree with this rationale.

Section 752(a) and the regulations thereunder make clear that liabilities resulting from funds borrowed by a partnership are treated as a contribution of capital by the partners and enter into the calculation of the partners' bases of their partnership interests. This is true of a limited partner in a situation where none of the partners has any personal liability, i.e., a nonrecourse borrowing by the partnership. It is also true, to a lesser extent, where there is personal liability on the part of another partner and the limited partner has not made the full capital contribution for which he is obligated. See sec. 1.752–1(e), Income Tax Regs. See also *Kingbay v. Commissioner*, 46 T.C. 147, 152–153 (1966). This treatment is consistent with section 1.704–1(e)(1)(iv), Income Tax Regs., which deals with capital as a material income-producing factor. The regulation does not consider "borrowed" capital at all. Instead, it pinpoints "employment of capital in the business conducted by the partnership" and distinguishes businesses which require substantial inventories or a substantial investment in plant, machinery, or other equipment from businesses which derive their income primarily as compensation for services. What is determinative for such purposes is the function capital serves for the business, not the source from which it is obtained. See *Hartman v. Commissioner*, 43 T.C. 105, 112, 118–119 (1964).

What clearly emerges from the facts herein is that the

partnership was in the business of purchasing land and constructing houses for sale on subdivided lots. Such transactions required the infusion of substantial sums of money. I perceive no valid reason why the fact that such funds were obtained from borrowings on the strength of Condiotti's credit should per se preclude a finding that capital was a material income-producing factor in the business of the partnership within the meaning of section 704(e)(1). Indeed, the majority's reasoning to the contrary, if carried to its logical conclusion, could cast doubt on the propriety of the allocation of income among partners in an ordinary limited real estate partnership with only one general partner, an approach which is fraught with substantial, if not insuperable, difficulties.

As I see it, capital was clearly a material income-producing factor in the business of Sonoma and the only issue herein is the impact, if any, of the borrowed funds upon the allocation of the partnership income among the petitioner and the trusts. Under section 704(e)(1), aside from the element of capital as a material income-producing factor, the question is whether the trusts' partnership status, and therefore the partnership, should be considered sham. While many aspects of the instant situation lend support for the basic thrust of respondent's argument that the partnership and the trusts' interests therein lacked economic reality and therefore should not be recognized, the fact of the matter is that the trusts did contribute capital, albeit in very small amounts. Perhaps these small capital contributions were not realistically required in the business of the partnership, but they were made and I am not prepared to say that, at least to the extent thereof, the trusts' partnership interests should not be recognized.[1] But there is still the further question as to the applicability of section 704(e)(2), which provides:

In the case of any partnership interest created by gift, the distributive share of the donee under the partnership agreement shall be includible in his gross income, except to the extent that such share is determined without allowance of reasonable compensation for services rendered to the partnership by the donor,

---

[1]None of the cases relied upon by respondent to support his argument of lack of economic reality involved situations where the trusts made any payment. Respondent also argues that the trustee "was not in a position to act as an independent fiduciary." One of the tests in determining "sham" is whether a trustee-partner is "amenable to the will of the grantor." See sec. 1.704-1(e)(2)(vii), Income Tax Regs. Such amenability should not be inferred from the mere fact that the trustee involved herein was also Condiotti's accountant. Cf. *Estate of Gilman v. Commissioner*, 65 T.C. 296 (1975), affd. per curiam 547 F.2d 32 (2d Cir. 1976).

and *except to the extent that the portion of such share attributable to donated capital is proportionately greater than the share of the donor attributable to the donor's capital.* * * * [Emphasis added.]

Under this provision, each trust's share of income cannot exceed that amount justified by its share of the capital of the partnership.

Petitioner argues that this provision is inapplicable because the partnership interests were purchased with trust assets. This argument is answered by section 1.704–1(e)(4), Income Tax Regs., which provides that a purported purchase of a capital interest in a partnership will have to meet the same requirements as an interest created by gift, unless the purchase is recognized as bona fide under section 1.704–1(e)(4)(ii), Income Tax Regs.[2]

I can think of few cases where the bona fides of the so-called purchases of the partnership interests by the trusts could be more open to question. The trusts herein were established and the partnership interests were acquired on the same day. The trusts were funded simply with a transfer of $1,000 to each trust and that entire amount was simultaneously invested in the partnership. While these elements standing alone might not be sufficient to justify ignoring the form of purchase, I think they are relevant when considered in the context of the allocation of partnership income in the instant case. The share of partnership income attributable to each trust, while proportionate to the initial capital investments by each partner, was grossly disproportionate when the role of Condiotti, and particularly the use of his credit standing, is taken into account. Nor is there any indication that investments by the trusts were intended to

---

[2]Sec. 1.704–1(e)(4)(ii), Income Tax Regs., provides:

(ii) *Tests as to reality of purchased interest.* A purchase of a capital interest in a partnership, either directly or by means of a loan or credit extended by a member of the family, will be recognized as bona fide if:

(a) It can be shown that the purchase has the usual characteristics of an arm's-length transaction, considering all relevant factors, including the terms of the purchase agreement (as to price, due date of payment, rate of interest, and security, if any) and the terms of any loan or credit arrangement collateral to the purchase agreement; the credit standing of the purchaser (apart from relationship to the seller) and the capacity of the purchaser to incur a legally binding obligation; or

(b) It can be shown, in the absence of characteristics of an arm's-length transaction, that the purchase was genuinely intended to promote the success of the business by securing participation of the purchaser in the business or by adding his credit to that of the other participants.

However, if the alleged purchase price or loan has not been paid or the obligation otherwise discharged, the factors indicated in (a) and (b) of this subdivision shall be taken into account only as an aid in determining whether a bona fide purchase or loan obligation existed.

promote the success of the partnership's business either through the participation of the trusts or the use of their credit. In short, I think it more than appropriate to treat the trusts' partnership interests as having been acquired by gift within the meaning of section 704(e)(2).

There remains the question of how the partnership income should be allocated to reflect the exception of section 704(e)(2) in a situation where "the portion of such share attributable to donated capital is proportionately greater than the share of the donor attributable to the donor's capital." In this connection, the following provision of section 1.704–1(e)(3)(ii)(*c*), Income Tax Regs., is pertinent:

In the case of a limited partnership * * * consideration shall be given to the fact that a general partner, unlike a limited partner, risks his credit in the partnership business.

Given the limited participation by the trusts, the status of petitioner as the sole general partner with the concomitant full risk of loss thereby imposed upon it, and the pervasive role of petitioner's sole shareholder (Condiotti), including his assumption of the ultimate full risk of loss via his guaranty, it is clear to me that the capital represented by the borrowed funds should be considered as petitioner's capital.[3] Once that is done and the petitioner's capital thus determined, I would allocate the partnership income in accordance with the respective capital interests of the petitioner and the trusts.

DRENNEN, FAY, HALL, and WILBUR, *JJ.*, agree with this dissenting opinion.

HALL, *J.*, dissenting: I join in Judge Tannenwald's dissenting opinion. I also share Judge Goffe's concern expressed in his concurring opinion that the majority's rationale does violence to

---

[3]Petitioner appears to argue that, if respondent is not correct in his contention that the partnership should be considered a sham, then none of the income of Sonoma should be attributable to petitioner, because all of the activities of Sonoma were "earned" by Condiotti, who "ran the whole show." I would reject this argument to the extent that it can be construed as seeking to avoid the deficiency herein by claiming that the proper taxpayer is Condiotti (who is not before the Court) for two reasons: (1) Since I do not think the partnership should be ignored, petitioner's argument falls by the wayside, and (2) in any event, I would have serious doubts as to whether, under the circumstances herein, petitioner could ignore the form of the transaction adopted by the parties. Cf. *Strong v. Commissioner*, 66 T.C. 12 (1976), affd. without opinion 553 F.2d 94 (2d Cir. 1977). Compare *Larson v. Commissioner*, 66 T.C. 159 (1976), on appeal (9th Cir., Sept. 14, 1976).

the previously well-understood meaning of "capital as a material income-producing factor." All too frequently, the understandable desire to strike out at an abusive situation tempts judges to the shortcut of distorting the meaning of well-understood words. But (because we tinker with a complex mechanism) such distortion can open the door to new abuses elsewhere. This case provides an example. If we establish the hitherto undreamed-of principle that borrowed capital cannot be considered in determining whether capital is a material income-producing factor, tax planners will have a colorable excuse for new avoidance plans. For example, a proprietor (simply by borrowing all the needed capital on his own credit) could possibly report the entire profit of a manufacturing business—instead of only 30 percent— as "earned income" subject to the 50-percent maximum tax. See sections 1348(b)(1)(A) and 911 (b). As Judge Tannenwald has demonstrated, Congress has provided us with statutory tools aplenty to handle abusive cases like this, without trying to make statutory phrases do more than they were designed for.

DRENNEN and WILBUR, *JJ.*, agree with this dissenting opinion.