RONALD L. GAUDERN, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1364–79.     Filed December 21, 1981.

*Edward H. Stone*, for the petitioner.
*Juan F. Vasquez*, for the respondent.

SIMPSON, *Judge*: The Commissioner determined a deficiency of $17,663.79 in the petitioner's Federal income tax for 1975. The sole issue for decision is whether capital was a material income-producing factor in the petitioner's business of selling bowling supplies at wholesale and retail within the meaning of sections 911(b) and 1348 of the Internal Revenue Code of 1954,[1] relating to the maximum tax on earned income.

---

[1]All statutory references are to the Internal Revenue Code of 1954 as in effect during 1975 unless otherwise indicated.

FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner, Ronald L. Gaudern, maintained his legal residence in San Antonio, Tex., at the time he filed his petition in this case. He filed his 1975 individual Federal income tax return with the Internal Revenue Service Center, Austin, Tex.

Between 1960 and 1968, the petitioner was a professional bowler. From 1961 through 1963, he was very successful, becoming one of the top 10 money winners on the U.S. pro bowlers tour. In 1960, he was hired to solicit orders for Columbia Industries, Inc. (CII), of San Antonio, Tex. CII manufactured and sold bowling balls. The contacts which the petitioner developed as a professional bowler helped to secure such business.

In 1963, the petitioner and another individual established their own partnership, Western Columbia. At that time, Western Columbia's sole business was the sale of bowling balls manufactured by CII. In 1971, the petitioner bought out his partner and commenced operation of Western Columbia as a sole proprietorship. The petitioner did not own stock in CII in 1975, and CII never had an ownership interest in Western Columbia.

After the petitioner bought out his partner, he embarked on a great expansion, taking charge of all of Western Columbia's management, sales, and advertising activities. It was under the petitioner's direction that Western Columbia's sales grew from $471,799.71 in 1971 to $2,978,741.21 in 1975. Western Columbia actually consisted of two businesses: Western Columbia Bowling Supply (WCBS) was a wholesale business which sold bowling apparel, accessories, and a full line of bowling supplies, including bowling balls, shoes, bags, gloves, and socks. The other business, Western Columbia Pro Shop, made sales at the retail level and offered such customer services as trophy engraving and hole drilling for bowling balls. During 1975, the wholesale operation accounted for approximately 95 percent of Western Columbia's gross receipts. In 1975, Western Columbia employed between 22 and 28 people, including 3 full-time salesmen and 8 to 10 order takers. WCBS distributed the largest wholesale bowling supply catalog in the country, and it carried the products of several

companies, including those of CII, Ebonite Corp., AMF Voit, Inc., Brunswick, and Colonial Mercantile & Mfg. Co.

In March 1971, the petitioner purchased property in San Gabriel, Calif., at a cost of $55,000, which was used as an office and warehouse for the business of Western Columbia. In the course of the next 2 years, he made a number of improvements and additions to the building. However, in April 1973, the building was completely destroyed by fire, along with approximately $200,000 worth of inventory.

In July 1973, the petitioner erected a new building on the same land at a cost of $156,834. Such building included a warehouse for WCBS, an office, and the retail pro shop. In July 1974, the petitioner purchased a second building in San Gabriel, at a cost of $128,551, and he made improvements on such building at a cost of $21,543. The purchase of such building increased Western Columbia's warehouse space, and the building was also used by the petitioner to assemble trophies.

In addition to the petitioner's investment in land and buildings, WCBS owned eight motor vehicles, which were used to deliver merchandise to customers within the local area. The cost basis of these eight vehicles totaled $41,420. Western Columbia also had furniture and fixtures with a cost basis of $15,809, trophy manufacturing equipment with a basis of $6,363, and inventory with a cost of $414,841.11 at the end of 1975.

On his Federal income tax returns for 1971 through 1975, the petitioner reported the following amounts of net profit and cost of goods sold for Western Columbia:

| Net profit | 1971 | 1972 | 1973 | 1974 | 1975 |
|---|---|---|---|---|---|
| Gross receipts | $471,799.71 | $985,462.61 | $1,591,653.05 | $2,236,098.55 | $2,978,741.21 |
| Cost of goods sold | 353,922.87 | 608,832.90 | 1,190,600.55 | 1,600,194.03 | 1,961,016.00 |
| Gross profit | 117,876.84 | 376,629.71 | 401,052.50 | 635,904.52 | 1,017,725.21 |
| Other income | --- | --- | 10,901.83 | 19,527.25 | 60,676.76 |
| Total income | 117,876.84 | 376,629.71 | 411,954.23 | 655,431.77 | 1,078,401.97 |
| Total deductions | 107,967.82 | 262,779.03 | 322,967.56 | 572,909.32 | 885,326.66 |
| Net profit | 9,909.02 | 113,850.68 | 88,986.77 | 82,522.45 | 193,075.31 |
| Cost of goods sold | | | | | |
| Beginning inventory | --- | 71,316.04 | 298,782.57 | 296,155.02 | 369,216.94 |
| Purchases | 425,238.91 | 836,299.43 | 1,187,973.00 | 1,673,255.95 | 2,006,640.17 |
| Total | 425,238.91 | 907,615.47 | 1,486,755.57 | 1,969,410.97 | 2,375,857.11 |

| Less ending inventory | $71,316.04 | $298,782.57 | $296,155.02 | $369,216.94 | $414,841.11 |
| Cost of goods sold | 353,922.87 | 608,832.90 | 1,190,600.55 | 1,600,194.03 | 1,961,016.00 |

It was the practice for the manufacturers of bowling supplies to extend credit to their purchasers under a concept known as "dating." Under the dating practice, merchandise was delivered without any payment for a prearranged period of time. During such period, interest was not charged, but some suppliers provided discounts if the merchandise was paid for before the expiration of the dating period. Interest was charged if the merchandise was not paid for on the expiration of the dating period. Some suppliers charged such interest at the rate of 2 percent per month. The typical dating periods ranged from 90 to 150 days. It was the petitioner's general practice to pay for merchandise on the expiration of the dating period. During 1975, the inventory of Western Columbia turned over approximately 5 times, and the inventory was on hand for an average of approximately 70 days.

The petitioner negotiated especially favorable arrangements with CII because of the quantity of merchandise which he purchased from that company and because of his close relationship with its owner. In 1975, he purchased $785,376 worth of merchandise from CII. As a part of the favorable arrangements, he secured a dating period of 120 days from CII, and he was allowed to purchase bowling balls at a special discount averaging $3 to $5 per ball. He also arranged with CII a line of credit of $250,000, which he secured by giving CII a $250,000 promissory note and a deed of trust on one of his properties in San Gabriel. Throughout the years, the petitioner continued to serve as a representative of CII at sales meetings and as a consultant, and he received an annual salary of $12,000 from CII. He did not receive a commission on his sales for CII.

The nature of the relationship between Western Columbia and its suppliers was that of buyer and seller. For example, when CII shipped goods to Western Columbia, CII reduced its inventory account and recorded such goods in its books as sold. If Western Columbia sold such merchandise and the account became worthless, Western Columbia sustained the bad debt. The manufacturer suffered no loss in such case. In addition, all

losses from the 1973 Western Columbia warehouse fire were suffered by Western Columbia, not the suppliers.

On his Federal income tax return for 1975, the petitioner treated the entire profit from Western Columbia as earned income subject to the maximum tax under section 1348. In his notice of deficiency, the Commissioner determined that capital was a material income-producing factor in the petitioner's business and that, accordingly, the petitioner's income for purposes of the maximum tax should be limited to 30 percent of the net profits of the business.

## OPINION

The sole issue for decision is whether capital was a material income-producing factor in the business of Western Columbia within the meaning of sections 911(b) and 1348. The petitioner has the burden of disproving the Commissioner's determination. Rule 142(a), Tax Court Rules of Practice and Procedure; *Welch v. Helvering*, 290 U.S. 111 (1933).

For 1975, section 1348 provided that the maximum tax on earned income was 50 percent, and section 1348(b)(1) adopted, for purposes of such section, the definition of earned income contained in section 911(b). Section 911(b) stated in part:

(b) DEFINITION OF EARNED INCOME.—For purposes of this section, the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered * * * . In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income-producing factors, under regulations prescribed by the Secretary, a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 30 percent of his share of the net profits of such trade or business, shall be considered as earned income.

This definition has been amplified by section 1.1348–3(a)(3)(ii), Income Tax Regs., which provided:

(3) Earned income from business in which capital is material. * * *

(ii) Whether capital is a material income-producing factor must be determined by reference to all the facts of each case. Capital is a material income-producing factor if a substantial portion of the gross income of the business is attributable to the employment of capital in the business, as reflected, for example, by a substantial investment in inventories, plant, machinery, or other equipment. In general, capital is not a material income-producing factor where gross income of the business consists principally of fees, commissions, or other compensation for personal services performed by

an individual. Thus, the practice of his profession by a doctor, dentist, lawyer, architect, or accountant will not, as such, be treated as a trade or business in which capital is a material income-producing factor even though the practitioner may have a substantial capital investment in professional equipment or in the physical plant constituting the office from which he conducts his practice since his capital investment is regarded as only incidental to his professional practice.

Such regulations have been based on and followed by the decisions of the courts.[2] See *Moore v. Commissioner*, 71 T.C. 533 (1979); *Bruno v. Commissioner*, 71 T.C. 191 (1978); see also *Holland v. Commissioner*, 70 T.C. 1046 (1978), affd. 622 F.2d 95 (4th Cir. 1980); *Rousku v. Commissioner*, 56 T.C. 548 (1971); *Fairfax Mutual Wood Products Co. v. Commissioner*, 5 T.C. 1279 (1945); *Edward P. Allison Co. v. Commissioner*, 63 F.2d 553 (8th Cir. 1933), affg. *William A. Corrao Electric Co. v. Commissioner*, 22 B.T.A. 1371 (1931).

The impressive success of Western Columbia was no doubt due to the extensive personal services furnished by the petitioner. He worked long hours, and he made use of the many contacts which he had established during his career as a professional bowler. It appears that his conduct of the business reflects considerable ingenuity, industry, and business acumen on his part. In addition, he did receive an annual payment from CII for the services which he performed for that company, and his pro shop received some small income for the services that it performed in engraving trophies and drilling bowling balls. Nevertheless, the fact that the petitioner contributed material personal services to the operation of the business does not entitle him to treat the entire profits as earned income under section 1348; if capital was a material income-producing factor, he is subject to the 30-percent limitation, notwithstanding the importance of his personal services. See *Moore v. Commissioner, supra*; *Weiss v. United States*, an unreported case (N.D. Ohio 1978, 42 AFTR 2d 78–6027, 78–2 USTC par. 9734); *United States v. Korczynski*, an

---

[2]For taxable years beginning after 1978, sec. 1348(b)(1) was amended to eliminate the 30-percent limitation on earned income derived from a trade or business in which capital was material. Rev. Act of 1978, Pub. L. 95–600, sec. 442(a), 92 Stat. 2878. Sec. 1348 has been repealed for taxable years beginning after 1981. Economic Recovery Tax Act of 1981, Pub. L. 97–34, sec. 101(c)(1), 95 Stat. 183.

unreported case (S.D. Ohio 1978, 42 AFTR 2d 78–5799, 78–2 USTC par. 9638); compare *Bruno v. Commissioner, supra.*

An examination of the record shows that capital was a material income-producing factor in the business of Western Columbia. In *Moore,* we had to decide whether a retail grocery business involved material capital, and we said:

Petitioners' services in retailing are also a material income-producing factor but are inseparable from the inventory purchased by its customers. The gross income of their business came entirely from the price paid for its groceries, not from any fees, commissions, or other compensation paid directly for personal services. We find that the capital employed in inventory, equipment, and building is a material income-producing factor in such business. [71 T.C. at 539.]

Such statements are equally applicable to the business of Western Columbia.[3] Virtually all of the profits of the business were attributable to the sale of bowling equipment. The receipts of Western Columbia were not fees for the rendering of personal services but were prices paid to purchase bowling equipment. To operate that business, a large inventory was required. At the beginning of 1975, the cost of such inventory was $369,216.94, and at the end of the year, its cost was $414,841.11. In addition to such inventory, the petitioner owned two properties, having an aggregate cost of at least $306,928, and other equipment with an aggregate cost of $63,592. Without such inventory, properties, and other equipment, the business of Western Columbia could not have been operated.

The petitioner argues that capital was not material in his business because he turned over the inventory so rapidly that he was not required to furnish the capital to pay for such inventory. He argues that he received the merchandise on the basis of a "quasi-consignment," and he claims that, in effect, his income was in the nature of broker's fees for handling the bowling equipment. However, the petitioner has shown no evidence that Western Columbia received merchandise on any arrangement that resembled a consignment. See 1 S. Willis-

---

[3]Compare *Novikoff v. Commissioner,* T.C. Memo. 1980–330, where we held that capital was a material income-producing factor in a movie theater business, notwithstanding the petitioner's arguments that his personal touch in selecting picture films and his years of experience in the industry were critical to the success of the business.

ton, Sales, sec. 2–1 (4th ed. A. Squillante & J. Fonseca 1973); *Standard Fashion Co. v. Magrane-Houston Co.*, 285 U.S. 346 (1922); see generally U.C.C. sec. 2–326 (1976); *Charles M. Stieff, Inc. v. City of San Antonio*, 130 Tex. 594, 111 S.W.2d 1086 (1938). Moreover, the petitioner has not elaborated on, nor has our research discovered, the mechanics of a "quasi-consignment" so as to allow us to make such a characterization. See J. White & R. Summers, Handbook on the Uniform Commercial Code 765–769 (1972).

The petitioner was more than a mere broker; he was an independent businessman who purchased the inventory and became the owner of it; he hoped to resell it at a profit and did so with considerable success. Once he purchased the inventory, he bore the risks of an owner: in the case of a loss by fire, or in the case of a sale for which he could not collect, the loss was his. His income was attributable to the fact that he was able to buy and sell at a profit; it was not attributable to fees for services rendered by him.

The petitioner also maintained that because of the dating practice, he was not required to furnish capital to acquire the inventory. Yet, neither the regulations nor the cases under section 1348 have made the result turn on whether the capital was furnished by the taxpayer; the only question is whether capital was material in producing the income of the business. Sec. 1.1348–3(a)(3)(ii), Income Tax Regs.; *Moore v. Commissioner*, 71 T.C. at 540; *Bruno v. Commissioner*, 71 T.C. at 199. In business, it is common to borrow money to acquire inventory, to acquire buildings, or to acquire necessary equipment; but the source of the capital has not been considered relevant for purposes of section 1348. The purpose of the test under section 1348 is to determine whether the income is attributable to the personal services of the taxpayer or whether such income was earned by capital, and in the light of that objective, the source of the capital has no significance. In effect, the petitioner borrowed the money to acquire the inventory from his suppliers, but the legal effect is no different than if he had financed his inventory by a line of credit from a financial institution. The inventory of Western Columbia surely contributed materially to the income of the business, regardless of how it was acquired.

In support of his argument, the petitioner relies on our

decision in *Carriage Square, Inc. v. Commissioner*, 69 T.C. 119 (1977). In that case, we had to decide whether certain persons had acquired a capital interest in a partnership, and under section 704(e)(1), the answer turned on whether capital was a material income-producing factor in the partnership. However, our decision in that case is not apposite. Section 1.704–1(e)(1)(i), Income Tax Regs., provides:

> (e) *Family Partnerships*—(1) *In general*—(i) *Introduction.* The production of income by a partnership is attributable to the capital or services, or both *contributed by the partners.* The provisions of subchapter K, chapter 1 of the Code, are to be read in the light of their relationship to section 61, which requires, inter alia, that income be taxed to the person who earns it through his own labor and skill *and the utilization of his own capital.* [Emphasis added.]

Thus, there, we had to decide whether the capital had been contributed by the partner (69 T.C. at 127), and since it had been acquired by a loan guaranteed by a nonpartner, we held that the borrowed money was not capital for that purpose (69 T.C. at 128). Moreover, the Court specifically stated that "borrowed capital, under other circumstances, may be 'capital' for section 704(e)(1) purposes." 69 T.C. at 127. Here, we have to decide a different question—whether the income was attributable to capital or to personal services, not who contributed the capital.

Finally, the petitioner maintains that he was working for CII and that, in substantial part, his income represented disguised commissions on sales for that company. However, the facts simply do not support that argument. Although he had a close working relationship with CII and was allowed to purchase its bowling balls at a substantial discount, the evidence shows that once the balls were shipped, he became the owner of them; he bore the risk of their loss. In substance, he was merely allowed a quantity discount as a result of the large volume of CII balls handled by him. Moreover, he did more than merely handle the products of CII; he also bought and sold the products of many other manufacturers of bowling equipment.

On the record, it is clear that capital was a material income-producing factor in the business of Western Columbia. Accordingly, we hold that for 1975, the profits from that business

were subject to the 30-percent limitation in applying section 1348.

*Decision will be entered for the respondent.*