ROBERT T. NELSON AND DIANA NELSON, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent. Nelson v. Commissioner
Docket Nos. 8670-79; 8681-79; 8706-79
United States Tax Court
T.C. Memo 1982-361; 1982 Tax Ct. Memo LEXIS 386; 44 T.C.M. (CCH) 277; T.C.M. (RIA) 82361; June 28, 1982
Dennis C. Roberts and Howard L. Wisdom, for the petitioners. Charles N. Woodward, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: In these consolidated cases respondent determined the following deficiencies in petitioners' Federal income taxes: Taxable Year
Petitioners
Docket No.
Ended
Deficiency
Robert T. and
Diana Nelson
8670-79
December 31, 1974
$ 463,105.87
Nelco Manufacturing
8681-79
April 30, 1975
188,680.35
Corp.
April 30, 1976
77,731.93
Nelson's Equipment
Rental Service, Inc.
8706-79
July 31, 1975
4,965.32
*387 The parties have agreed to the disposition of several issues and some concessions have been made. The two issues remaining for decision are: 1. Whether petitioner Robert T. Nelson received a constructive dividend in 1974 from Nelco Manufacturing Corporation as a result of a transfer for $ 47,200 of six porta-shot blast machines from the corporation to him which respondent determined to be a "bargain sale." 2. Whether all of the income realized by petitioner Robert T. Nelson from Nelson's Painting Service during the taxable year 1974 is subject to the maximum tax computation of petitioner for that year pursuant to section 1348[2] or whether earned income from Nelson's Painting Service should be limited to 30 percent if both capital and personal services were material income-producing factors in that business. FINDINGS OF FACT Some of the facts have been stipulated by the parties and are so found. Robert T. Nelson (petitioner) and Diana Nelson are husband and wife who resided in Oklahoma City, Oklahoma, when they filed *388 their petition herein. They filed a timely joint Federal income tax return for the year 1974. Nelco Manufacturing Corporation (Nelco) is an Oklahoma corporation which had its principal place of business in Oklahoma City at the time it filed its petition herein. Nelco is engaged in the manufacture of sandblasting, corrosion prevention and painting equipment. Nelco filed timely U.S. Corporation Income Tax Returns for the taxable years ended April 30, 1975 and April 30, 1976. The stock of Nelco is owned as follows: Relationship
Percentage
to R.T. Nelson
of Ownership
R.T. Nelson
27
Diana Nelson
Wife
25
Michael Nelson
Son
9
Ione Nelson
Daughter-in-Law
5
Lavon Roberts
Daughter
9
Jerry Roberts
Son-in-Law
5
Roberta Thompson
Daughter
9
Fred Thompson
Son-in-Law
5
Peggy Sullivan
Employee of Nelco
3
Clyde Wilcoxson
Employee of Nelco
3
Nelson's Equipment Rental Service, Inc. (Equipment) is an Oklahoma corporation whose principal place of business was located in Oklahoma City when it filed its petition herein. Equipment is engaged in the rental of sandblasting, corrosion prevention and painting equipment. The stock *389 of Equipment is owned 70 percent by petitioner and 30 percent by his wife. Equipment timely filed its U.S. Corporation Income Tax Return for the taxable year ended July 31, 1975. Nelson's Painting Service, which began business in 1946, is a sole proprietorship owned by petitioner. Its principal business activity is contract painting. During the early 1970's the petitioner developed a porta-shot blast machine for use in his painting business. The machine projects steel shot in lieu of sand for cleaning surfaces. It is designed so that the steel shot will hit the surface to be cleaned, ricochet and bounce back into the machine to recycle. Petitioner developed two types of porta-shot blast machines -- one vertical and one horizontal. He is the sole owner of the patent rights of the machine, but Nelco manufactures them. The porta-shot blast machines were first used in 1972 to clean the deck of a Navy aircraft carrier. Nelco has the right to sell the porta-shot blast machines subject to paying the petitioner a royalty of $ 2,000 per machine. In late 1973 the petitioner and Esso Chem Coatings, a subsidiary of Esso Chemicals (now Exxon), initiated communications relating to the *390 possible use by Esso Chem of the porta-shot blast equipment manufactured by Nelco. At first the negotiations between Esso Chem and petitioner concerned the transfer of technology, such as licensing agreements and the sale of patents. No agreement was reached with respect to such matters. In early 1974 Esso Chem contacted petitioner about the use of porta-shot blast machines on a contract basis. No agreement was reached on that matter. In April 1974, Exxon Chemical Company (successor to Esso Chem) sent the petitioner written confirmation of Exxon's serious interest to license exclusive use of petitioner's patent rights and technological know-how for the blast machines in the European area for consideration of $ 1.5 million. As part of the offer, Exxon sent petitioner a proposed "heads of agreement" for license acquisition and a purchase agreement for the blast machines. The proposed purchase agreement contained a provision that petitioner would supply to Exxon two pairs of porta-shot blast machines (each pair consisting of one vertical and one horizontal machine plus a service truck suitable for operating in Europe) for a consideration of $ 120,000 for each pair. This offer *391 from Exxon was never accepted by petitioner nor was an agreement based on such terms ever consummated. The major reason that a patent or licensing agreement was never entered into between Exxon and petitioner was Exxon's belief that it would be difficult to secure a firm patent position on a mechanical device such as the porta-shot blast machine. On August 19, 1974, Exxon sent petitioner a proposal which narrowed the scope of its previous offer. In the new offer Exxon offered to purchase two units of porta-shot blast machines from the petitioner for a total consideration of $ 500,000. The definition of a "unit" in such offer was two horizontal porta-shot blast machines, one vertical machine, a service truck, spare parts and the necessary backup equipment to operate the machines. The August 19, 1974, offer from Exxon also contained a provision that petitioner would sell Exxon additional units for a flat price of $ 120,000 per unit. Exxon's offer of August 19, 1974, was not accepted by petitioner nor was any agreement entered into between him and Exxon as a result of that offer. While further negotiations with Exxon continued, the petitioner purchased from Nelco on September 1, 1974 and *392 October 1, 1974, respectively, four horizontal porta-shot blast machines for $ 7,000 each and two vertical machines for $ 9,600 each, for a total of $ 47,200. It cost Nelco about $ 3,500 to manufacture a machine. On October 15, 1974, Exxon followed with another offer concerning the sale of two sets of porta-shot blast machines for a total consideration of $ 500,000. In that offer a set of porta-shot blast machines was defined as one horizontal machine and one vertical machine, a service truck, backup equipment and spare parts. That offer also contained a provision that Exxon would be able to purchase additional horizontal machines at $ 12,000 to $ 15,000 per machine, which price was based upon the bare machine and did not include any trucks, spare parts, or backup equipment. In addition, the offer contained a provision that Exxon would be able to purchase additional sets for $ 120,000 per set. Petitioner responded with a counter offer on October 28, 1974, which included a provision that Exxon would have the right to purchase additional horizontal blasting units for a fixed price of $ 16,500 each. This was for the machine only and did not include spare parts, backup equipment *393 or a truck. On January 14, 1975, Exxon authorized petitioner to purchase a truck to support one new vertical machine and two new horizontal machines. In accordance with Exxon's instructions, the petitioner purchased a truck for $ 29,080 designed for use with the porta-shot blast machine and was reimbursed for the cost of the truck by Exxon. By April 1975, Exxon and the petitioner had reached a "handshake agreement" for petitioner to sell to Exxon two horizontal porta-shot blast machines and one vertical machine for a total consideration of $ 256,500. This sale included the following items: a. Two horizontal porta-shot blast machines. b. One vertical porta-shot blast machine. c. Truck, including large oil reserve, large dust collector, large oil cooler, a PTO for power, and split shaft to turn the pumps. d. Tandem pumps. e. Valves. f. Big tool boxes. g. Hose h. Dollys. i. Accessories for cone roof. j. Wind ring for floating roofs. k. Miscellaneous incidentals. The April 1975 sale between Exxon and petitioner was never reduced to a written agreement. The three porta-shot blast machines which petitioner sold to Exxon were new machines. The original *394 cost of the three blasting machines, without spare parts and other equipment, was reported by Exxon as $ 132,569. The three machines sold to Exxon in April 1975 were three of the same machines which petitioner purchased from Nelco in the fall of 1974. After the purchase of the porta-shot blast machines from petitioner in 1975, Exxon encountered various difficulties in the operation of the machines. By 1976, Exxon had decided to withdraw from the coating business. Petitioner had the right of first refusal to repurchase the machines which he had sold to Exxon in 1975 upon their resale by Exxon. Petitioner declined Exxon's offer of October 12, 1976, to repurchase the three machines for $ 66,000. Exxon eventually sold the three porta-shot blast machines to Trident Marine in 1977 for a total purchase price of $ 60,000. That sale included all the items which had previously been sold by petitioner to Exxon. The decline in the value of the porta-shot blast machines from the time Exxon purchased them from petitioner in 1974 until the time they were resold to Trident Marine in 1977 was a result of a decline in the coating market since 1974. At the time of the resale of the machines *395 by Exxon to Trident Marine, the machines were operational, but the operating level was unsatisfactory. If Exxon had remained in the coating business, the machines would have been more valuable to it than the selling price to Trident Machine represented. In March 1976, Nelco sold a porta-shot blast machine unit to Versailles Inc., a Canadian company, for a total consideration of $ 68,000. However, this was a sale of used machines. At that time the painting and coating market was depressed. In his notice of deficiency dated March 27, 1979, respondent determined that petitioner purchased the six porta-shot blast machines in 1974 from Nelco at less than fair market value and, therefore, he received a dividend in the amount of $ 572,800 as a result of the purchases. The principal business activity of Nelson's Painting Service was contract painting of industrial equipment, oil tanks and ships. Schedule C attached to petitioner's Federal income tax return for 1974 shows that Nelson's Painting Service had gross income in that year of $ 2,890,977.24. Approximately $ 800,000 of such income was produced from the operation of porta-shot blast machines and support equipment. The balance *396 was produced from conventional painting which did not require surface removal or sandblasting. Schedule 4 appended to Schedule C of the return shows that Nelson's Painting Service had depreciable assets on December 31, 1974, totaling $ 351,913.78. These included painting equipment of $ 122,647.59 and automotive equipment of $ 164,045.67 which were necessary in conducting its painting business. The depreciable assets also included a building, furniture and fixtures and a mobile office. Trucks were used to transport the materials and equipment. Petitioner used the porta-shot blast machine in the operation and conduct of the business of Nelson's Painting Service. Either petitioner or Nelson's Painting Service owned four porta-shot blast machines prior to 1974 and at the end of 1974 a total of ten machines were owned. Each porta-shot blast machine will do the labor of approximately 12 persons. Nelson's Painting Service had a total of 20 sandblasting machines during the year 1974. Nelson's Painting Service would lease as many as four to six porta-shot blast machines from Nelco depending upon the workload of its contract painting business. On his 1974 Federal income tax return *397 the petitioner treated all of the net income ($ 449,202.90) from his painting business as earned income (i.e., "personal service income") for purposes of the maximum tax provisions of section 1348. Respondent, in his notice of deficiency, determined that since capital was a material income-producing factor in that business, only 30 percent of the net income therefrom could be treated as earned income. ULTIMATE FINDINGS OF FACT 1. The sales of the six porta-shot blast machines by Nelco to petitioner on September 1, 1974 and October 1, 1974, were not arm's-length transactions at fair market value. 2. The fair market value of the six porta-shot blast machines when sold by Nelco to petitioner was $ 265,138. 3. Petitioner received a constructive dividend of $ 217,938 from Nelco in 1974. 4. Nelson's Painting Service was engaged in a trade or business in 1974 in which both personal service and capital were material income-producing factors. OPINION Issue 1. Constructive Dividend -- Bargain Sales
Although generally income does not result from the purchase of property for less than its fair market value, a bargain sale by a corporation to a shareholder may result in *398 a dividend to the shareholder to the extent that the fair market value of the property transferred exceeds the consideration paid therefor. Whether the transfer or sale of property to the shareholder constitutes a dividend to him for Federal income tax purposes is not controlled by the intent of the parties to the transaction but depends upon the circumstances and actual effect of the particular transaction. It is immaterial that the transfer assumes the form of a sale or that there is no express or formal declaration of a dividend, especially where it is evident that the sale does not constitute an arm's-length transaction. Palmer v. Commissioner, 302 U.S. 63 (1937); Waldheim v. Commissioner, 25 T.C. 839 (1956), affd. 244 F.2d 1 (7th Cir. 1957); Dellinger v. Commissioner, 32 T.C. 1178 (1959). In a bargain sale situation the shareholder is treated as having received a "distribution" to which section 301 applies. See also section 1.301.1(j), Income Tax Regs., which provides, in part, that: If property is transferred by *399 a corporation to a shareholder which is not a corporation for an amount less than its fair market value in a sale or exchange, such shareholder shall be treated as having received a distribution to which section 301 applies. In such case, the amount of the distribution shall be the difference between the amount paid for the property and its fair market value. * * * The principal dispute here is whether petitioner's purchases of six porta-shot blast machines from Nelco, his controlled corporation, for $ 47,200 were arm's-length transactions at fair market value. Petitioner contends that the evidence supports that he purchased the machines at their fair market value. Respondent contends otherwise in view of the ongoing negotiations between the petitioner and Exxon and the subsequent sale of three machines and support equipment to Exxon in early 1975 for amounts far in excess of those paid to Nelco by petitioner in the fall of 1974. We agree with the respondent that petitioner's purchases of the machines from Nelco were not arm's-length transactions at fair market value. However, we think his determination of the fair market value of the machines alone is too high. Based on the *400 evidence in this record, we have concluded that $ 265,138 more accurately represents the total fair market value of the machines at the time they were purchased from Nelco. In arriving at that figure we have eliminated the value of support equipment, such as the truck power-takeoff hydraulic systems, tail gate lifts, cables, tank dollies, spare parts and an array of accessories. We find it unnecessary to reiterate the extensive negotiations between petitioner and Exxon which culminated in the ultimate sale of three porta-shot blast machines and support equipment to Exxon. The facts are fully set forth in our findings. These were good faith negotiations and offers to purchase and sell the machines which are guides to aid the Court in determining fair market value. Dellinger v. Commissioner, 25 T.C. at 1185. Petitioner has advanced several arguments in an attempt to minimize the effect of the Exxon negotiations and the eventual sale of the three machines. None of them are convincing. First, the petitioner argues that Nelco did not have the authority to sell the machines. This argument is contrary to the evidence. Petitioner testified that Nelco had the right *401 to sell machines subject to obtaining his permission and paying him a royalty of $ 2,000 per machine. Since petitioner was the president and principal shareholder of Nelco, such an arrangement was tantamount to obtaining permission from himself to sell the machines through Nelco. Thus, he could readily sell the machines at any time either through his corporation or personally. The evidence bears out this conclusion because machines were sold to petitioner by the corporation in 1974, sold to Exxon individually by petitioner in 1975, and in 1976 machines were sold to Versailles Inc., apparently through the corporation. In addition, there is no indication that the $ 2,000 royalty per machine was ever paid to petitioner. In essence, he had total control over the sale of the machines and the entity through which they would be sold. Second, the petitioner has attempted to downplay the Exxon negotiations by arguing that they involved only patent rights and licensing agreements. Again, the evidence clearly shows otherwise. As early as August 1974, Exxon made an offer to purchase outright the porta-shot blast machines. This offer not only included the initial purchase of the machines *402 but also provided for the purchase by Exxon of additional sets of machines at a reduced purchase price. On October 15, 1974, Exxon renewed its offer to purchase the machines from petitioner by again offering to buy two sets of machines and also providing for the purchase of additional sets of machines at a reduced purchase price. Petitioner responded by a counter-offer which included the initial sale of machines to Exxon and provisions for selling additional machines at a firm price. Petitioner did not need any hindsight. He knew he would have a ready market to sell the machines and he knew the approximate price the market would bear. He was obviously aware of what the machines would bring on the open market when he transferred them from Nelco to himself at a price substantially below their fair market value. Third, the petitioner argues that since he purchased the machines from Nelco at a 100 percent markup over cost, the purchase price was reasonable. We reject this argument because a percentage markup does not indicate an arm's-length fair market value where, as here, an actual arm's-length transaction on the open market is available to determine fair market value. Cf. *403 Lufkin Foundry and Machine Company v. Commissioner, 468 F.2d 805, 808 (5th Cir. 1972). We think the internal 100 percent markup has no bearing in determining an arm's-length fair market value in the light of actual negotiations and the resulting arm's-length sale with Exxon, an unrelated purchaser. Fourth, the petitioner contends that two subsequent sales establish a lower fair market value for the machines. We think that neither sale was comparable to the sale by Nelco to petitioner in the fall of 1974. The evidence shows that the two machines sold to Versailles, Inc. in March 1976 for $ 68,000 were used and that the industrial coating market was severely depressed at that time. Even so, the sale price to Versailles, Inc. was substantially more than that paid by petitioner to Nelco in 1974. Nor were the three machines resold in 1977 by Exxon to Trident Marine for $ 60,000 comparable to the 1974 sale. At the time of the resale the machines had been used for two years; they were not in satisfactory working condition; and they had encountered major maintenance problems and needed modifications. In addition, they were resold in a depressed coating market. We are *404 persuaded that the evidence herein establishes that Nelco sold the six porta-shot blast machines to the petitioner, its controlling shareholder, for substantially less than their fair market value in 1974. Therefore, we hold that the petitioner , as a result of such bargain sales, realized a constructive dividend from Nelco pursuant to section 1.301-1(j), Income Tax Regs., in the total amount set out in our ultimate findings of fact. Issue 2. Maximum Tax -- Capital as Material Income-Producing Factor
As applicable to the year 1974, section 1348 provided that earned income would, in effect, be taxed at no more than a 50 percent rate. "Earned income" was defined, as pertinent here, as any income which is earned income within the meaning of section 911(b), which provided as follows: (b) Definition of Earned Income. -- For purposes of this section, the term " earned income" means wages, salaries, or professional fees, and other amounts received as compensation for *405 personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income-producing factors, under regulations prescribed by the Secretary or his delegate, a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 30 percent of his share of the net profits of such trade or business, shall be considered as earned income. Section 1.1348-3(a)(3)(ii), Income Tax Regs., provided as follows: (ii) Whether capital is a material income-producing factor must be determined by reference to all the facts of each case. Capital is a material income-producing factor if a substantial portion of the gross income of the business is attributable to the employment of capital *406 in the business, as reflected, for example, by a substantial investment in inventories, plant, machinery, or other equipment. In general, capital is not a material income-producing factor where gross income of the business consists principally of fees, commissions, or other compensation for personal services performed by an individual. Thus, the practice of his profession by a doctor, dentist, lawyer, architect, or accountant will not, as such, be treated as a trade or business in which capital is a material income-producing factor even though the practitioner may have a substantial capital investment in professional equipment or in the physical plant constituting the office from which he conducts his practice since his capital investment is regarded as only incidental to his professional practice. If we find that capital was a material income-producing factor in petitioner's contract painting business, only 30 percent of his net income therefrom was eligible for the maximum tax benefit. Petitioner contends that he is eligible to use the maximum tax provisions because capital was not a material income-producing factor in his painting business. He argues that he kept no inventories; *407 that his painting service is a labor intensive endeavor; that the cost of capital assets as compared to the gross income received from the painting service is relatively insignificant; and that the gross income from the use of porta-shot blasting equipment is much less than that produced by conventional painting. He further argues that his investment in painting and automotive equipment and a building should not be viewed as substantial, but rather incidental to the production of his income from such business. To the contrary, respondent contends that the petitioner is limited under section 1.1348-3(a)(3)(i), Income Tax Regs., to treating only 30 percent of his net profits as earned income because capital was a material income-producing factor in his business. Respondent stresses that the material part capital played in petitioner's painting business is evidenced by (1) the substantial amount of gross income ($ 800,000) attributable to the employment of capital; (2) the substantial investment of capital necessary to operate the business; and (3) the extensive use of the blast machines for cleaning metal surfaces, particularly as a labor-saving device. *408 We agree with the respondent. We have previously addressed this issue in cases involving section 1348 and other provisions of the Code. See Moore v. Commissioner, 71 T.C. 533 (1979), where we followed the general rule that capital is a material income-producing factor if a substantial portion of the gross income of the business is attributable to the employment of capital in the business. Capital is a material-income producing factor "if the operation of the business requires substantial inventories or substantial investments in plant, machinery, or other equipment," and not if the "gross income of the enterprise consists principally of fees, commissions, or other compensation for personal services." Rousku v. Commissioner, 56 T.C. 548, 551 (1971). This same approach is employed in section 1.1348-3(a)(3)(ii), Income Tax Regs.
Under this test we think the petitioner's painting service necessarily employed capital as a material income-producing factor. We do not consider as insignificant the fact that the use of the porta-shot *409 blasting equipment produced almost 30 percent of the gross income of Nelson's Painting Service. Each machine that was used replaced the labor of 12 employees. Thus, these capital assets produced a substantial portion of the business gross income. In addition, the capital investments in, and expenses of, petitioner's painting business underscore the importance of capital in the production of his business. Indeed, the very nature of the business and the work done undercut the petitioner's attempt to minimize the capital element. See and compare Gaudern v. Commissioner, 77 T.C. 1305 (1981), involving a bowling supplies business; Moore v. Commissioner, supra, involving a grocery business; Rousku v. Commissioner, supra, involving an automobile repair shop; Gullion v. Commissioner, T.C. Memo. 1982-106, involving a concrete flatwork business; and Wilson v. Commissioner, T.C. Memo. 1982-289, involving an egg-producing business. Petitioner's reliance on Bruno v. Commissioner, 71 T.C. 191 (1978), is misplaced. The facts of that case, which involved a bail bonding business, *410 are clearly distinguishable from those present here. The capital used in Bruno's business did not, per se, produce income. It had gross income that consisted principally of revenues derived from the sale of services, similar to businesses engaged in rendering professional services, such as accounting, engineering or real estate brokerage. Accordingly, we hold that for the purposes of section 1348 capital was a material income-producing factor in petitioner's painting business. It therefore follows that only 30 percent of the net profits of the business qualifies for the benefits of that section. To reflect the agreed or conceded issues and our conclusions with respect to the disputed ones, Decisions will be entered under Rule 155. Footnotes
1. Consolidated herewith are the cases of Nelco Manufacturing Corp., docket No. 8681-79 and Nelson's Equipment Rental Service, Inc., docket No. 8706-79.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated.↩