EMORY E. HARRIS; THE ESTATE OF PHYLLIS A. HARRIS, DECEASED, EMORY E. HARRIS, EXECUTOR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Harris v. Commissioner
Docket No. 11451-82.
United States Tax Court
T.C. Memo 1984-189; 1984 Tax Ct. Memo LEXIS 485; 47 T.C.M. (CCH) 1515; T.C.M. (RIA) 84189; April 16, 1984. Richard A. Allbee, for the petitioners. Bruce Baker, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT *486 AND OPINION WILES, Judges: Respondent determined the following deficiencies in petitioners' Federal income taxes: Year
Deficiency
1976
$18,782
1977
7,001
1978
11,357
After concessions, the sole issue for decision is whether, for purposes of section 1348, [1] petitioners employed capital as a material income-producing factor in the business of publishing cookbooks. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, Emory E. Harris, was a resident of Franklin County, Iowa, when he filed the petition in this case. Throughout the years in issue, petitioner was married to Phyllis A. Harris and they filed their joint Federal income tax returns for 1976, 1977, and 1978, with the Internal Revenue Service Center, Kansas City, Missouri. Phyllis A. Harris died on November 28, 1979. (Hereinafter Emory E. and Phyllis A. Harris will be referred to as petitioners.) Emory E. Harris is the duly appointed and acting executor of the estate of Phyllis A. Harris, deceased. *487 Throughout the years in issue, petitioners and Custom Graphics, Inc., were partners in a partnership known as General Publishing and Binding (hereinafter GPB). GPB prints and binds cookbooks from recipes submitted by churches and social organizations that resell the cookbooks as a fund raising activity. Neither GPB nor anyone associated with it develops new recipes. GPB began in 1962 when Mrs. Harris and a friend, Mrs. Surratt, began typing, collating, and editing cookbooks at petitioners' kitchen table. Originally, Mrs. Harris did all the typing and collating and Mrs. Surratt did the binding, billing, and mailing of the finished products. Through hard work and personal efforts the business expanded rapidly, but petitioners and Mrs. Surratt maintained their separate job functions. Petitioners' primary function in the GPB partnership consisted of typing, collating, and printing the cookbooks. Custom Graphics, Inc.'s [2] primary responsibility consisted of binding, billing, and shipping the cookbooks. Throughout the years in issue, GPB had no formal partnership agreement, *488 but it filed partnership returns and the parties conducted themselves as a valid partnership. For purposes of this opinion, the parties have stipulated that GPB was a valid partnership. During the years in issue, the respective partnership interest of the GPB partners were as follows: Phyllis A. Harris, 25 percent; Emory E. Harris, 25 percent; Custom Graphics, Inc., 50 percent. GPB's oral partnership agreement was unique. Generally, GPB paid all inventory costs and other expenses consisting primarily of packaging, postage, and freight charges, but GPB did not own or lease any of the buildings or equipment used in the business. Petitioners and Custom Graphics, Inc., each separately acquired and used the buildings and equipment necessary to perform their respective functions in the GPB partnership, and each employed and paid their own work forces. As a result of this arrangement, net income distributions from GPB to petitioners and Custom Graphics, Inc., consisted of gross receipts less cost of goods sold and common expenses. Petitioners' net profits from the printing business, however, were derived by deducting from their allocable portion of GPB's net income the expenses they *489 incurred in typing, collating, and printing the cookbooks. Similarly, Custom Graphics, Inc.'s net profits from the printing business were calculated by deducting from their allocable portion of GPB's net income the expenses they incurred in binding, billing, and shipping the cookbooks. The following chart shows the respective amounts of income, expenses, and depreciable assets reported by GPB and petitioners, and Custom Graphics, Inc.'s cost basis of depreciable assets during the years in issue: GPB
1976
1977
1978
Gross Receipts
$1,213,816.00
$1,256,695.75
$1,418,802.54
Cost of Goods
Sold
294,017.11
292,928.77
312,350.08
Common Expenses
101,449.82
106,686.92
132,843.88
Net Income
818,349.07
857,080.06
973,608.58
Petitioners
1976
1977
1978
Distributions from
GPB
$409,174.54
$428,540.00
$486,804.00
Operating Expenses
(including salaries
and depreciation)
208,578.98
246,616.00
314,190.00
Cost basis of
depreciable assets
85,671.00
192,263.00
217,690.00
Custom Graphics, Inc.
1/31/76
1/31/77
1/31/78
Cost basis of
depreciable assets
$95,667.00
$125,451.00
$231,719.00
Throughout the years in issue, petitioners *490 purchased a variety of new and used printing presses and they constructed a 40 by 60 foot building to house the equipment used in the business. On January 1, 1976, petitioners used 14 printing presses in their operation. Between 1976 and 1978, petitioners acquired 14 additional printing presses, although there were no more than 17 printing presses in use during any single year. During the years in issue, petitioners employed approximately 75 people, including their son and daughter-in-law. A majority of petitioners' employees were engaged in typing the recipes on masters used in the printing process, and many of the remainder were employed as printers. Petitioners, their son and daughter-in-law primarily engaged in employee training; they did not actively participate in the typing or printing processes, although they did help maintain the equipment. GPB's primary customers during the years in issue were organizations seeking to sell cookbooks as a fund raising activity. When an organization contacted GPB, GPB sent the organization a kit, developed by petitioners and Mrs. Surratt, containing information regarding prices, cover stock, and the process for submitting the recipes *491 for publication. To facilitate typing, petitioners preferred to have recipes submitted on the free forms provided in the kits, but they accepted recipes in almost any form, including newspaper clippings and handwritten cards. Petitioners organized the recipes into different sections and submitted them to the typists, who typed them according to procedures developed by Mrs. Harris which were contained in a book entitled "How To Type A Cookbook." GPB received approximately 600 new orders for cookbooks per year, excluding reprints. Of these new orders, approximately 100 were special orders that required additional work because they were printed on colored paper or they required different art work, [3] symbols, or covers. For all cookbooks, it was necessary to contact the clients regarding any special problems, and few books could be organized and sent to the typist without contacting the client at least once. Much of GPB's success stemmed from repeat customers. Approximately 75 percent of *492 customers asked for reprints of previously published cookbooks. Petitioners kept master copies of each book for use in reprinting, and it was only necessary to add new sections or alter those recipes that the client wanted changed in order to provide the requested reprints. In addition, petitioners developed several processes that allowed them to print cookbooks economically. Among other things, petitioners developed a process for typing the recipes on direct image masters and getting their equipment to produce more copies from each master than could others using the same equipment. In computing their income taxes for the years 1976, 1977, and 1978, petitioners treated their distributive shares of GPB's net income, less expenses incurred in typing, collating, and printing, as earned income subject to the maximum tax rate of 30 percent under section 1348. In the notice of deficiency, respondent determined that petitioners did not meet the earned income provisions of section 1348 and thus respondent limited the amount subject to the maximum tax to 30 percent of petitioners' net profit. OPINION We must determine whether capital was a material income-producing factor in GPB's *493 cookbook publishing business. Section 1348(a), as in effect during the years in issue, imposed a maximum tax rate of 50 percent on "personal service taxable income." Section 1348(b)(1)(A) [4] defines the term "personal service taxable income" to include any income which is "earned income" within the meaning of section 401(c)(2)(C) or section 911(b). The controlling section in this case is section 911(b) which defines earned income as "wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered." Where both personal services and capital are material income-producing factors section 911(b) further provides that "a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 30 percent of his share of the net profits of such trade or business, shall be considered as earned income." [5]
*494 If capital is found to be a material income-producing factor in the cookbook printing business, the statutory limitation under section 911(b) will serve to exclude 70 percent of petitioners' net profits from the benefits of section 1348. For purposes of the preceding sentence, petitioners' "net profits" are calculated by deducting from their allocable portion of GPB's net income the expenses they incurred in printing and collating the cookbooks. Section 1.1348-3(a)(3)(i), Income Tax Regs.
Petitioners have the burden of proving that they are entitled to the tax benefits of section 1348. Rule 142(a), Tax Court Rules of Practice and Procedure. Whether capital is a material income-producing factor is a factual question that must be determined by reference to all of the facts and circumstances of each case. Bruno v. Commissioner,71 T.C. 191, 197 (1978). It is the use of capital in producing business net income, not its source, that is controlling. Gaudern v. Commissioner,77 T.C. 1305, 1312 (1981). The test of whether capital is a material income-producing factor is laid out in section 1.1348-3(a)(3)(ii), Income Tax Regs., which provides: *495 (ii) Whether capital is a material income-producing factor must be determined by reference to all the facts of each case. Capital is a material income-producing factor if a substantial portion of the gross income of the business is attributable to the employment of capital in the business, as reflected, for example, by a substantial investment in inventories, plant, machinery, or other equipment. In general, capital is not a material income-producing factor where gross income of the business consists principally of fees, commissions, or other compensation for personal services performed by an individual. Petitioners contend that the income they derived from the GPB partnership consisted principally of compensation for personal services. Petitioners stress the importance of the ability to judge the particular likes and dislikes of a customer, and the importance of personal discussions with customers. Petitioners assert that without constant attention to customer needs, and use of know-how built up through years of trial and error experience, they would be unable to profitably run their business. Respondent, on the other hand, maintains that capital was a material income-producing *496 factor in petitioners' business because it had substantial investments in inventories and depreciable assets in the nature of buildings and equipment. In addition, respondent concludes that petitioners were engaged in the sale of a product rather than the performance of services. Accordingly, respondent argues that only 30 percent of petitioners' net profits from the business qualify for the benefit of the 50 percent maximum tax rate under section 1348. In determining whether capital is a material income-producing factor, we must focus at the partnership level, [6] but we must also consider the capital owned and employed by petitioners and Custom Graphics, Inc. See Gaudern,supra. Based on the record herein, we find that capital was material to the production of GPB's and petitioners' net income. Among other things, GPB used substantial amounts of capital to purchase ink, paper, binding, cover stock, and similar materials used in the manufacture of the cookbooks. For example, during 19768 GPB made purchases of $294,017.11 worth of raw materials, equal to 24 percent of the reported gross receipts of $1,213,816. During 1977 and 1978, GPB expended 23 and 22 *497 percent, respectively, of its gross receipts on raw materials. In addition, GPB reported miscellaneous expenses of $101,449.82, $106,686.92, and $132,843.88, respectively, during 1976, 1977, and 1978. This use of substantial capital to purchase inventories and to meet operating expenses is persuasive evidence that capital was a material income-producing factor in GPB's cookbook publishing business. Moreover, petitioners and Custom Graphics, Inc., had substantial capital investments in depreciable assets used in GPB's business, including a building, printing presses, binding equipment, office equipment, and office furniture. During 1976, 1977, and 1978, petitioners' cost basis in depreciable assets was $85,671, $192,263, and $217,690, respectively, while Custom Graphics, Inc.'s cost basis in depreciable assets during the same period was $95,667, $125,451, and $231,719, respectively. These items were essential to GPB's business and they contributed materially to the production of GPB's, and ultimately, petitioners' net income. While we believe that petitioners' personal services were a material income-producing *498 factor, these services were incidental to the creation of a manufactured product that was sold to customers. GPB's gross income came entirely from the price paid for cookbooks, and not from any fees, commissions, or other compensation paid for personal services. As we stated in Van Kalker v. Commissioner,81 T.C. 91 at 98 (1983), on appeal (7th Cir., Oct. 24, 1983): The statute as it stood [during the years in issue] recognizes that both capital and services may be income-producing factors. It does not permit the courts to compare the relative materiality of the capital and personal service components and hold that capital was not material even if the income was attributable primarily to personal services. If capital is material, * * *, the statutory 30 percent limitation applies. While petitioners certainly expended great energy in building GPB's business and developing profitable know-how, the issue under section 1348 is not how efficiently petitioners ran their business. Moore v. Commissioner,71 T.C. 533, 540 (1979). Moreover, while petitioners' personal services were vital to the sale of cookbooks, petitioners have not shown that their *499 personal services were so unique that in essence their clients purchased personal services in which capital was merely an incidental factor. See Van Kalker v. Commissioner,supra at 97, n. 11. Accordingly, we hold that capital was a material income-producing factor in petitioners' business of publishing cookbooks. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩
2. During the years in issue, Custom Graphics, Inc., was a corporation wholly owned by Mrs. Surratt.↩
3. Generally, the art work and special designs were not original. Petitioners typically traced or redrew small pictures obtained from color books to fill in blank spaces around recipes.↩
4. Sec. 1348 was repealed for taxable years beginning after December 31, 1981, when the highest marginal rate was reduced from 70 percent to 50 percent. Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 101(c)(1), 95 Stat. 183, and sec. 101(a), 95 Stat. 176. ↩
5. Sec. 1348(b)(1)(A) was amended by sec. 442(a), Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2878, for taxable years beginning after December 31, 1978, to eliminate the 30 percent ceiling in computing personal service income.↩
6. See Black v. Commissioner,T.C. Memo. 1983-245↩.