**Leesley B. HARDY and Joan Hardy, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 83–C–74.**

United States District Court, E.D. Wisconsin.

June 6, 1984.

Dudley Godfrey, Jr., Godfrey & Kahn, Milwaukee, Wis., for plaintiffs.

Mark Nebergall, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## DECISION and ORDER

TERENCE T. EVANS, District Judge.

Leesley and Joan Hardy brought this action to obtain a refund of federal income taxes which they allege were erroneously assessed against them. They claim that income Leesley Hardy earned as a part of his real estate development business was incorrectly taxed at a higher rate than that permitted by the law that applied at that time. The case is before me on the United States' motion for summary judgment. The material facts are not in dispute. For the reasons explained below, the government's motion is granted.

The issue in this case is how much of Hardy's income for the years in question was eligible for the 50% maximum tax rate on earned income. Certain provisions of the Tax Code limit the amount of a person's income eligible for this maximum tax rate treatment when the taxpayer is engaged in a business in which both personal services and capital are "material income-producing factors". The Hardys' contest the government's position that capital was material to the production of Leesley Hardy's income.

### FACTS

Hardy is in the business of subdividing and developing residential real estate and then selling it. The income which is in dispute in this case, income earned during the 1976 and 1977 tax years, came to Hardy through a joint venture which he had entered with a subsidiary of a savings & loan association. The subsidiary, Waukesha Financial Services, Inc. (WFSI) solicited Hardy's professional services in order to locate real estate for it to purchase and develop. Between 1971 and 1975, Hardy provided WFSI with substantial real estate development services without compensation. These services were undertaken and provided on the understanding that WFSI

would later compensate Hardy when the properties were sold.

During 1975, the project reached a point where individual lots could be sold. It was at this juncture that the project first began to produce income, in the form of proceeds from the sale of the lots. The parties' agreement as to how the profits would be divided between them is embodied in two joint venture agreements. The agreements are for present purposes identical.

Article V of each joint venture agreement provides for the equal division of the venture's net profits. All expenses of the venture, including an adjustment of $4,000 per acre for the cost of the land involved, are accounted for in this net profit determination.

Hardy contends that his share of the venture's profits represents a deferred payment of the customary commissions which he would have earned on each sale and improvement of a developed lot. Hardy, beginning at page 3 of his brief, states that

> because WFSI desired to make [his] compensation contingent on the accuracy of his predictions as to the profitability of the project, [they] agreed that he would be compensated by receiving a percentage of the net profit. Hardys' projections indicated that one-half (½) of the net profit would be approximately equivalent to 15%-20% of the gross income which he would receive under a traditional commission basis.

With Hardy's expertise and efforts, the joint venture was successful. In 1976, the combined net income of the two joint ventures was $375,876. In 1977, it was $502,669. Over these years, Hardy's share totalled over $400,000.

On their joint federal income tax returns for 1976 and 1977, Mr. and Mrs. Hardy reported all of their income from the project as earned income eligible for the 50% maximum tax rate. However, the Commissioner of Internal Revenue questioned their treatment of the joint venture income. He determined that only 30% of the income which Hardy received was eligible for the 50% maximum tax rate. The balance, he determined, was taxable at a higher rate. Accordingly, he assessed against them deficiencies of $10,491 in 1976 and $17,200 in 1977. The Hardys' paid these amounts, together with accrued interest. They then instituted this suit for a refund.

## DISCUSSION

Section 1348 of the Internal Revenue Code, 26 U.S.C. § 1348, generally limits the maximum rate on earned taxable income to 50%. Section 1348 defines "earned income" in the same terms as it is defined in another section of the Code, § 911(d). Section 911(d) provides:

> ... the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered ... In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income-producing factors, ... a reasonable allowance as compensation for personal services rendered by the taxpayer, not in excess of 30 percent of his share of the net profits of such trade or business, shall be considered as earned income.

Thus, if capital was a material income-producing factor in Hardy's business, only 30% of the Hardys' income was eligible for the 50% maximum tax rate. If capital was not a material income-producing factor, all of the income was eligible for the 50% maximum tax rate.

Section 1.1348–3(a)(3)(ii) of the Treasury Regulations on Income Tax (1954 Code) states:

> ... Capital is a material income-producing factor if a substantial portion of the gross income of the business is attributable to the employment of capital in the business, as reflected for example by a substantial investment in inventories, plant, machinery, or other equipment. In general, capital is not a material income producing factor where gross income of the business consists principally of fees, commissions, or other compensation for personal services performed by an individual. ...

Hardy raises two reasons why he believes that the 30% limit should not apply to him. First, since he did not purchase any of the land which was sold nor contribute any capital to the operation of the joint venture, he contends that capital was therefore not material to the production of his income. Second, he argues that his income really consisted only of commissions. His participation in the joint venture was simply the most convenient means for delivering commissions to him.

## I.

 Hardy's first argument misconceives the focus of the pertinent IRS regulation. As the language of the regulations makes clear, the question is not whether the capital is material to the production of an *individual partner's* income. Rather, the question is whether the capital plays a material role in producing the gross income of the *business*. At the business level, there is no question that the capital on which Hardy's joint venture was founded— the residential land—was crucial to the joint venture's gross income.

Hardy's argument has met a similar fate in other cases. In *Gaudern v. Commissioner*, 77 T.C. 1305 (1981), a professional bowler had contributed his knowledge of the sport and professional contacts to a successful bowling goods distributorship. Gaudern maintained that, because of an accounting practice peculiar to the industry, he was not required to furnish capital in order to acquire his inventory. Therefore, he argued that capital did not play a material role in production of his income. The Tax Court replied:

> Yet, neither the regulations nor the cases under section 1348 have made the result turn on whether the capital was furnished by the taxpayer; the only question is whether the capital was material in producing the income of the *business*. ... [T]he source of the capital has no significance.

*Id.* at 1312 (emphasis added).

Other courts have also focused their analysis on the business, rather than on the individual taxpayers who run the business. In *Moore v. Commissioner*, 71 T.C. 533 (1979), the Tax Court analyzed expert testimony which revealed that the profits earned by the taxpayer were attributable almost entirely to the taxpayer's extraordinary personal ingenuity, long hours and direct services. However, the court concluded that

> all of the income of the business is attributable to ... capital investments. Petitioner's services in retailing are also material income-producing factor but are inseparable from the inventory purchased by its customers.

*Id.* at 539.

*Black v. Commissioner*, 46 T.C.M. 1983-245 (Dec. 40,088(M) 1983) demonstrates that these principles apply with full force to the facts of this case. *Black* involved a general partner of a residential real estate development partnership. Black insisted that his income was attributable solely to his extraordinary efforts in turning a desert region of Los Alamos, New Mexico into a successful residential subdivision. The court wrote:

> We do not question that petitioner's extensive services were essential to the production of the partnership's income. The fact that his services were indispensable, however, does not show that capital was not material. The land itself and the capital needed to develop it were also indispensable to the production of the income. ... Petitioner next contends that we should focus on him individually rather than on the partnership, and he emphasizes that he personally had little "capital invested in his provision of these services" ... But this argument overlooks the fact that we are here dealing with the income produced by a partnership of which the petitioner was a member....

*Id.* at 32 (footnote and citation omitted).

## II.

█ Hardy's second argument also misperceives the focus of the pertinent regula-

tions. Whether Hardy's share of the joint venture's receipts constituted disguised commissions is irrelevant. The question under the regulations is whether the "gross income of the business" consisted of commissions. Thus, the focus is on the joint venture's income, not the profit shares which it, in turn, paid to the joint venturers.

Therefore, the Commissioner's treatment of Hardy's income was appropriate. As in *Black*, it is clear that "the buyers of the lots, however, did not pay the partnership fees for petitioner's services. Instead, the partnership sold, and the buyers paid for, lots which had been improved through the use of capital as well as the application of petitioner's personal buyers paid for, lots which had been improved through the use of capital as well as the application of petitioner's personal services." *Id.* at 32. See also *Moore* at 359. These cases may be contrasted with cases upon which Hardy relies: *Bruno v. Commissioner*, 71 T.C. 191, 199 (1978) (income received by bail bondsperson was not limited by 30% rule because "form of income received was a fee based upon a flat percentage of the bail bond's face amount") and *Zahler v. Commissioner*, 684 F.2d 356 (6th Cir.1982) (broker who was also general partner continued to receive commissions from clients).

Furthermore, it would not be fair to say that commissions were the only link between Hardy and the finances of the joint venture. Although the joint venture agreement explicitly provides that Hardy was not personally liable under the financing agreements worked out between WFSI and its parent, Waukesha Savings & Loan Association, he was personally liable for one-half of the venture's losses which could not be satisfied out of assets or liability insurance. In that sense, Hardy bore risks and ownership interests similar to those described in *Black* at 32 n. 5 and *Gaudern* at 1312.

## CONCLUSION

I am not without sympathy for the Hardys' case. Common sense leads to the con-

clusion that it was Hardys' personal services which made the most difference between profits and loss in the joint venture. Furthermore, the unfairness of the IRS regulations at issue in this case may have been the cause of their later repeal. *See* § 101(c)(1) of Public Law 97–34, August 13, 1981; *Wilson v. Commissioner*, 46 T.C.M. 1982–289 at 1476 (Dec. 39,047(M) 1982).

However, the language of these regulations is quite clear. However technically or formalistically they operate, they are nonetheless the authority which governs the outcome of this case.

For the foregoing reasons, therefore, the government's motion for summary judgment is GRANTED.

IT IS ORDERED that this case is DISMISSED.